**In re WILLOWOOD EAST APARTMENTS OF INDIANAPOLIS II, LTD., Debtor.**

**Bankruptcy Nos. 2–90–00155, 35–1673897.**

United States Bankruptcy Court, S.D. Ohio, E.D.

March 22, 1990.

Thomas C. Scott, Richard K. Stoval, Thompson, Hine and Flory, Columbus, Ohio, for Lincoln Nat. Bank & Trust Co.

Kenneth R. Cookson, Carlile, Patchen, Murphy & Allison, Columbus, Ohio, for debtor.

Marilyn Shea–Stonum, Jones, Day, Reavis & Pogue, Columbus, Ohio.

Jay Alix, Southfield, Mich., Trustee for Cardinal Industries, Inc.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio.

## OPINION AND ORDER ON MOTION FOR RELIEF FROM STAY

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court upon the motion filed by Lincoln National Bank and Trust Company ("Lincoln") for relief from the automatic stay. Lincoln's motion for an order excusing the state court receiver's compliance with the turnover provisions of 11 U.S.C. § 543, the debtor's application for appointment of attorney and the debtor's motion for an order authorizing its use of cash collateral are also before the Court. The motions were heard February 20, 1990, following which the Court took the matter under advisement.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(G). The following constitute findings of fact and conclusions of law.

## I. PRELIMINARY FACTS

Willowood East Apartments of Indianapolis II, Ltd. (the "Debtor") is the owner of certain real property known as the Willowood East Apartments of Indianapolis, II (the "Property") located in Indianapolis, Indiana. The Property includes a 60 unit apartment complex comprised of efficiency, one bedroom and two bedroom apartments.

On April 15, 1985, the Debtor executed a Promissory Note for the sum of $1,125,-000.00 payable to Cardinal Industries Mortgage Company ("CIMC"). CIMC assigned the Promissory Note to Lincoln on May 5, 1985. The Promissory Note is due and payable May 1, 1991.

The obligations of the Debtor under the Promissory Note are secured by a Mortgage, Assignment of Rents and Security Agreement (the "Mortgage") dated April 15, 1985. CIMC assigned the Mortgage to Lincoln April 30, 1985. The Mortgage was recorded on May 14, 1985. The Mortgage grants to Lincoln a lien on the Property and all personal property located thereon or relating thereto (collectively the "Collateral"), including but not limited to, all rental income and revenue from the Property (the "Rents"). The security interest in the personal property was perfected by the filing of a financing statement with the county recorder.

Under the terms of the Promissory Note, the Debtor was required to make monthly payments of principal and interest. The last payment Lincoln received directly from the Debtor occurred in March, 1989, and represented the February, 1989 installment. Thereafter the Debtor was in default of its obligations. Lincoln then initiated state court proceedings to foreclose on the Property and also sought the appointment of a state court receiver. Regency Windsor Management, Inc. (the "Receiver") was appointed receiver on June 13, 1989. The Receiver took possession of the Property on September 1, 1989, and has remained in possession since that date.

A decree of foreclosure and order of sale were entered on a default basis by the state court on October 5, 1989. A foreclosure sale was scheduled for January 10, 1990 at 10:00 a.m. On January 10, 1990, just minutes before the scheduled sale, the Debtor filed its voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

Lincoln previously filed a motion to dismiss the Debtor's Chapter 11 petition on January 11, 1990. After an expedited hearing, the motion to dismiss was denied on January 25, 1990. At that time limited relief to initiate a new foreclosure process was granted, conditioned upon the resolution of this relief from stay action. Lincoln now seeks relief from the automatic stay under both § 362(d)(1) and (d)(2).

## II. ISSUES

There are three issues for the Court's determination:

1. Has Lincoln shown cause for relief from the automatic stay by the Debtor's failure to provide adequate protection of Lincoln's interest in the Collateral within the meaning of 11 U.S.C. § 362(d)(1)?

2. Has Lincoln shown cause for relief from the automatic stay within the meaning of 11 U.S.C. § 362(d)(1) for lack of good faith by the Debtor in filing its petition?

3. Is Lincoln entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(2) because the Debtor lacks equity in the Property and the Property is not necessary for an effective reorganization?

## III. DISCUSSION

### A. Adequate Protection As Cause For Relief From Stay Pursuant To 11 U.S.C. § 362(d)(1)

■ It is unclear whether Lincoln contends that the Property has declined in value since the filing of the Debtor's bankruptcy petition. The only evidence before the Court, however, including the testimony of Lincoln's appraiser, indicates that the Property has not declined in value. Therefore, the Debtor has sufficiently demonstrated that Lincoln's interest in the Property is adequately protected.

■ The Court also finds that Lincoln's interest in the Rents is adequately protected. Lincoln successfully sought the appointment of the Receiver and, thus, voluntarily consented to the latter's collection and use of the Rents. As long as the Receiver retains his control over the Rents,

Lincoln cannot argue that its interest in the Rents is not adequately protected.

Accordingly, the Court will not grant relief from stay pursuant to § 362(d)(1) for lack of adequate protection.

B. *Lack of Good Faith As Cause For Relief From Stay Pursuant To 11 U.S.C. § 362(d)(1)*

■ Lincoln has also alleged that the timing and manner in which the Debtor's bankruptcy petition was filed evidence bad faith and that such bad faith constitutes "cause" for relief from stay under § 362(d)(1). While a lack of good faith may constitute "cause" for relief from stay, the fact that a petition is filed minutes before a foreclosure sale does not, standing alone, establish bad faith which warrants relief from the automatic stay.

■ The Court believes that the issue of whether a Chapter 11 petition is filed in good faith is properly determined by whether the debtor has any assets, whether the debtor has an ongoing business it needs to reorganize and whether there is a reasonable probability that a confirmable plan can be proposed. *See In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir. 1985). Objective indicia of bad faith dealings may also be examined.

■ This Debtor clearly has assets and an ongoing business to reorganize. The reason for the last minute nature of the bankruptcy filing was explained satisfactorily in an earlier hearing before the Court. Further, the remaining factor, whether there is a reasonable probability that a confirmable plan can be proposed, should not generally be determined where the exclusivity period has not run and the Debtor has not been given a reasonable opportunity to submit a plan. This case is barely two months old and the Debtor has nearly another two months in which it has the exclusive right to submit a plan of reorganization. Unless Lincoln conclusively shows that no confirmable plan is possible, this Court will not grant relief from the automatic stay in the initial stages of a Chapter 11 case for cause on bad faith grounds where the asset and ongoing busi-

ness factors are resolved in a debtor's favor. Lincoln has not made such a conclusive showing in this case.

Therefore, the Court will not grant relief from stay pursuant to § 362(d)(1) for lack of good faith.

C. *Relief From Stay Pursuant To 11 U.S.C. § 362(d)(2) For Lack of Equity And Lack of Necessity of The Property For An Effective Reorganization*

■ Section 362(d) of the Bankruptcy Code further provides in relevant part:

(d) On request of a party in interest ... the Court shall grant relief from the stay provided under subsection (a) of this section ...

(2) with respect to a stay of an act against property under subsection (a) of this section if—

(A) the debtor does not have equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

Lincoln purports to meet this two-part test by asserting that (1) the Debtor has no equity in the Property since Lincoln's claim against the Debtor is greater than the fair market value of the Property and (2) the Property is not necessary for an effective reorganization because any plan proposed by the Debtor could not be confirmed.

The undisputed testimony of Lincoln's representative, Kent C. Litchin, established that as of the day of hearing, the Debtor owed Lincoln on the Promissory Note the principal sum of $1,111,074.94 and accrued interest of $97,504.26. Under the terms of the Promissory Note, Lincoln is also entitled to attorney's fees which Litchin estimated at $11,311.17. Adding these figures, the total claim of Lincoln against the Debtor as of February 20, 1990 is $1,220,135.55.

The testimony of the appraiser hired by Lincoln, Larry D. Meisner, was that the fair market value of the Property is approximately $1.2 million. Meisner used an income approach and a market approach,

and then utilized both of these values to arrive at his final figure.

For his income approach, Meisner initially broke down the studios, the one bedroom apartments and the two bedroom apartments by their monthly rates per square foot. Based on his breakdown, he projected potential gross rental income of $231,440.00 per year. Adding $2,500.00 for vending machine income, the total potential gross income for the Property would be $233,940.00 per year. Meisner substracted $11,697.00 for vacancies based on a 5% vacancy rate which he regarded as reasonably typical for that market. That low vacancy projection is due, in part, to the proximity of the Property to a military installation and the availability of short term leases which are in demand by employees of that installation. Meisner then deducted annual expenses of $106,252 or about 48%. These expenses included a $10,325 replacement reserve. These calculations resulted in an annual net income of $115,999. Applying a 10.5% capitalization rate, which he feels is reasonably typical in that market, Meisner found that the Property has a fair market value of approximately $1.1 million.

Meisner's market approach was based on a gross income multiple analysis of five recent sales of apartment complexes in the Indianapolis area. A gross income multiplier analysis involves dividing the gross annual income into the sale price to obtain a multiple. The multiples Meisner found for the five properties ranged from 5 to 6.09. From this range, he selected multiples of 5.5, 5.75, and 6.0. He multiplied the gross income of the Property, which he had already determined to be $222,243.00, by each of these multiples. The resulting values ranged from $1,222,000.00 to $1,333,000.00. From these, he chose a value of $1.3 million.

Comparing both the income and the market methods, Meisner concluded that the fair market value of the Property is $1.2 million for no particular reason other than that both methods were used.

The Debtor did not seriously dispute the $1.2 million appraised value. In fact, Robert F. Pausch, an employee of CIMC, using his own income approach, arrived at nearly the same value as Meisner. Pausch took the 1990 budgeted net income of $121,963.00 found in Debtor's Exhibit B and divided that by a capitalization rate of 10.5%, the same capitalization rate used by Meisner. The result was approximately $1,117.00.00. Pausch apparently did not employ a market approach.

Because Lincoln's claim against the Debtor ($1.22 million) is greater than Meisner's appraised value ($1.2 million), the Court is satisfied that the Debtor presently has no equity in the Property even though Meisner's testimony at one point acknowledged the possibility of a "pretty thin" equity.

Lincoln offers three reasons for its proposition that there is no reasonable likelihood that the Debtor will be able to reorganize. First, Lincoln argues that because it will undoubtedly control the vote of its secured class and because its unsecured claim will constitute more than two-thirds of the total amount of all unsecured claims, there will be no impaired class which will accept any plan proposed by the Debtor, as required by 11 U.S.C. § 1129(a)(10), without its consent. Therefore, the Debtor will not be able to proceed to confirmation under the cramdown provisions of 11 U.S.C. § 1129(b). Second, Lincoln contends that the absolute priority rule in 11 U.S.C. § 1129(b)(2)(B) mandates that Cardinal Industries, Inc.'s ("CII") interest as a general partner be cancelled if Lincoln, as an unsecured creditor, rejects the plan; and, thus, the very purpose of this reorganization fails. Third, should Lincoln elect to have its entire claim treated as secured pursuant to 11 U.S.C. § 1111(b)(2), the Debtor would be unable to propose any plan which would provide Lincoln with property having a present value equal to Lincoln's interest in the Collateral, as required by 11 U.S.C. § 1129(a)(7)(B); and, therefore, any such plan would also fail to meet the fair and equitable test of § 1129(b)(2)(A).

The Court agrees that Lincoln will control the vote of its secured class. However, Lincoln's contention that it will likely

control the vote of any general unsecured class is subject to two assumptions: (1) that Lincoln will have an unsecured claim greater than one-third of the general unsecured claims, excluding those of insiders, and (2) that there will be only one general unsecured class. Given the closeness of Lincoln's claim and the Property's value, it is not entirely clear that Lincoln will have a significant unsecured claim. And it is not established at this early date that all general unsecured claims, including Lincoln, will be in a single class or impaired. *See In re Aztec Company*, 107 B.R. 585 (Bankr.M.D. Tenn.1989). Nor can the Court find, at this early date that the objective reasons given for the Debtor's projections in net income in 1990 are in error. The value of the Property thus may increase with a corresponding effect upon the unsecured position available to Lincoln. Finally, Lincoln may, as it has threatened to do, elect treatment of its claim under 11 U.S.C. § 1111(b); and if this occurs, Lincoln will, of course, no longer be an unsecured creditor. Therefore, even if Lincoln continues to oppose any plan, there may be an impaired class which accepts a proposed plan.

Lincoln's second assertion again necessarily assumes its continued status as an unsecured creditor. If Lincoln should elect treatment under 11 U.S.C. 1111(b), the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) would not apply on its account. Moreover, Lincoln assumes that the only purpose of the Debtor's reorganization is to realize monies for the benefit of CII, an assumption that the Court is unwilling to make. Again, it is simply too early in this case to posit such assumptions about the particular reorganization to be undertaken.

Lincoln's third assertion assumes that should it elect treatment of its claim under 11 U.S.C. § 1111(b), the Debtor will be unable to provide it with deferred cash payments equalling at least the allowed amount of its claim or the present value of its interest in the Collateral, whichever is greater. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). Lincoln's claim as of the date of hearing was $1,220,135.55. The Court cannot determine at this time, however, what will be the amount of Lincoln's claim at the effective date of some future plan. However, for the purposes of this motion, the Court will assume a static claim and will use the fair market value of $1.2 million determined by Lincoln's appraiser. Under those facts, if Lincoln elects under § 1111(b), and rejects the plan, the Debtor's plan must provide to Lincoln a stream of payments totaling the greater of $1,220.135.55 or the present value of $1.2 million.

In order to perform the analysis under § 1129(b)(2)(A)(i)(II), it is necessary to determine an appropriate discount rate. Normally, the appropriate discount factor is the current market rate of interest for similar loans in the region. *Memphis Bank & Trust v. Whitman (In re Whitman)*, 692 F.2d 427 (6th Cir.1982). Larry Meisner, Lincoln's appraiser, and Robert Pausch, an employee of CIMC, both testified that a bank lending money for a similar project today would charge an interest rate of 9.75% to 10.5%. Lincoln, however, argues that no bank would approve such a loan where there is no equity in the property; and if it did, the interest rate would be higher to account for the additional risk. Balancing these viewpoints, the Court believes that the appropriate discount factor, were confirmation of a plan to be considered today, would be at least 10.5%.

The monthly payment required to amortize a $1.2 million debt over 30 years at 10.5% is $10,976.87. Lincoln's appraiser, Larry Meisner, calculated the monthly net operating income of the Property to be $9,666.25. If the Debtor's 1990 budgeted net income figure is used, there would be $10,165.25 available for debt service. Based on these numbers, it is not clear at this time whether the Debtor will be able to provide Lincoln deferred cash payments with a present value of $1.2 million. It is clear, however, that either of these payments paid out over a period of 10 or 11 years would equal Lincoln's claim of $1,120,135.55.

■ Increased emphasis has been placed on a debtor's ability to effectively reorga-

nize as part of the test for relief from stay since the issuance of an opinion by the Supreme Court of the United States in *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In the initial phases of a Chapter 11 case, however, the standard by which a debtor must show that it will be able to reorganize is less stringent. *Timbers* at 376, 108 S.Ct. at 632–33. The standard suggested for the early days of a case would require the Court to find that the Debtor lacks any realistic prospect of effective reorganization. *Id.* This Court does not understand how any but the most hopeless of debtors could be shown to have no realistic prospect of reorganization in the initial days of a Chapter 11 case. Certainly that standard should not be satisfied because the major secured creditor capable of forcing any plan proposed by a debtor into a cramdown initially announces an unwillingness to support any plan which would give the secured creditor less than every right it had prior to bankruptcy. Such a result would be both inequitable and unrealistic, and absent compelling evidence, would be an inappropriate strategy for the Court to sustain.

When Lincoln and other secured lenders to partnerships in which Cardinal Industries, Inc. ("CII") is the general partner were defendants in a class action injunction adversary arising in CII's Chapter 11 case, the response from many, if not most, of the lenders appearing in that action was that the partnerships should file their own Chapter 11 cases. The lenders then asserted that once those cases were filed, resolution of their problem loans to those partnerships could be attempted by negotiation while their cash and property were protected by the provisions of the Bankruptcy Code. Now those individual Chapter 11 cases are coming into this Court in significant numbers. Almost immediately upon those bankruptcy filings, however, many of the partnership debtors are the target of four or five separate motions from their respective mortgage lenders. The deluge of such motions, with emergency hearing requests, have made it difficult for the Court and its staff to attend to the concerns of non-Cardinal related cases also before the Court. Except for concerns about the use of rent monies in which the lenders have an interest, the justification for all the motions is not apparent.

This admonition is not directed specifically at Lincoln and especially not at its counsel which has exhibited one of the more reasoned approaches generally. Lincoln just happens to be the movant whose motion is being decided at a time when the flood of such motions seems especially overwhelming. Accordingly, the Court has determined to communicate to Lincoln and to other present or potential movants that a lender who seeks to prevent the reorganization of a Cardinal partnership debtor in the early stages of its case, prior to any attempt to negotiate a resolution of its problem loan, if it is to prevail, will have to convince the Court that any reorganization effort is completely unrealistic or that other cause exists of a serious nature. The fact that the Debtor cannot completely service the loan as of its bankruptcy filing date, without more, will not suffice.

In this case, the Debtor currently cannot service Lincoln's loan under its original terms. There was evidence that its income could be increased by surcharges or rent increases for short term tenants. There also may be ways to decrease the percentage of gross income allocated to operating expenses, as that percentage appears somewhat higher than normal in this case. Although the evidence of increased income or decreased expenses could have been more specific, at this stage of the case the evidence presented was sufficient to prevent loss of the only significant asset of the estate by relief from stay. This Debtor's position is different from that presented in *Lakeshore Apts. of Ft. Oglethorpe, II, Ltd.*, 109 B.R. 278 (Bankr.S.D.Ohio 1989) where the lender's loan had matured prior to the bankruptcy filing, there was no apparent way to increase rents or occupancy in an area where rental properties were languishing, and the case had pended for nearly seven months prior to the grant of relief from stay.

## IV. CONCLUSION

Based upon the foregoing, Lincoln's Motion for Relief from Stay is denied. The Court shall separately issue orders forthwith on Lincoln's motion for an order excusing the state court receiver's compliance with the turnover provisions of 11 U.S.C. § 543, the Debtor's application for appointment of attorney and the Debtor's motion for an order authorizing its use of cash collateral.

IT IS SO ORDERED.