**In re METRO COMMUNICATIONS, INC., t/a Metrosports, Debtor.**

**METRO COMMUNICATIONS, INC., Plaintiff,**

v.

**PACIFIC–10 CONFERENCE, a/k/a PAC–10, Defendant.**

**Bankruptcy No. 85–0552.
Adv. No. 89–0302.**

United States Bankruptcy Court,
W.D. Pennsylvania.

June 25, 1990.

Phillip S. Simon, Simon & Simon, Pittsburgh, Pa., for Committee of Unsecured Creditors.

Charles J. Vollmer, Pollard, Walker & Vollmer, Pittsburgh, Pa., for defendant/PAC–10.

Stephen J. Laidhold, Sable, Makoroff & Libenson, Pittsburgh, Pa., for debtor.

Stephen I. Goldring, Office of U.S. Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Metro Communications, Inc. ("Debtor"), acting by and through its court-authorized Unsecured Creditors Committee, has brought this adversary action pursuant to 11 U.S.C. § 547(b), in which it seeks to avoid certain payments to Defendant Pacific–10 Conference ("PAC–10") arising out of an agreement concerning telecasting rights for the 1984 college football season.

Debtor alleges that the payments, made pursuant to letters of credit, constituted preferential transfers and seeks to avoid and recover them for the benefit of its bankruptcy estate.

PAC–10 denies that the payments in question were preferential and additionally asserts that the payments were part of a contemporaneous exchange for new value given; consequently, Defendant avers they are not subject to avoidance under 11 U.S.C. § 547(c)(1).

Judgment will be entered for PAC–10 and against Debtor for reasons set forth below.

## FACTS

Debtor was a syndicator of broadcast rights and had been involved in the televising of collegiate sporting events.

PAC–10 is a nonprofit association of various universities which conducts and promotes interscholastic sporting events.

On May 7, 1984, Debtor and PAC–10 executed an agreement whereby Debtor was granted the right to televise fifteen (15) exposures of PAC–10 football games for each of the 1984, 1985, and 1986 football seasons. Debtor was to pay PAC–10 $5,100,000.00 in "guaranteed minimum aggregate rights fees" for the 1984 season ($340,000.00 per game payable sixty (60) days after the game was played) and was to pay $6,150,000.00 and $6,750,000.00 for the 1985 and 1986 seasons, respectively.

The agreement further provided that by September 1, 1984, August 1, 1985, and August 1, 1986, respectively, Debtor was to pay PAC–10, in advance, the equivalent of one-fifteenth (1/15th) of the guaranteed minimum aggregate rights fee to which PAC–10 was entitled for that particular season. This payment was to be applied towards the total payments due for that season. Debtor was also to furnish PAC–10, by these same dates, with irrevocable standby letters of credit in the amount of the balance of the guaranteed minimum aggregate rights fees for that particular season.

Sometime prior to August 13, 1984, Debtor and PAC–10 entered into negotiations concerning a "new agreement" for the 1984 football season. As a result of an acknowledged economic change in the industry, Debtor had informed PAC–10 that it could not and would not perform under the terms of the agreement of May 7, 1984. PAC–10, after weighing its legal and economic alternatives, decided not to exercise its legal options and instead elected to void the prior contract and enter into a "new agreement" with Debtor.

Debtor and PAC–10 formally executed another agreement dated August 13, 1984, which applied only to the 1984 football season. This second agreement granted Debtor the right to televise twelve (12) exposures of PAC–10 football games, with a guaranteed minimum aggregate rights fee reduced to $3,000,000.00, or $250,000.00 per exposure. As was the case with the previous agreement, this fee was payable "within 60 days after the date on which such game is played".

The subsequent agreement further provided that, by September 1, 1984, Debtor was to pay PAC–10, in advance, the equivalent of one-twelfth (1/12th) of the guaranteed minimum aggregate rights fees to which PAC–10 was entitled for the 1984 season. This payment was to be applied towards the total payment due for the season. On August 30, 1984, Debtor paid the required $250,000.00 to PAC–10.

The agreement also specified that Debtor was to furnish PAC–10 with three (3) irrevocable standby letters of credit in the amount of the balance of the guaranteed minimum aggregate rights fee due for the 1984 season. These letters of credit were to be delivered to PAC–10 on the following dates and were to be in the following amounts:

| Date | Amount |
| --- | --- |
| September 4, 1984 | $1,000,000.00 |
| September 28, 1984 | 1,250,000.00 |
| October 26, 1984 | 500,000.00 |

The first letter of credit was to serve as security for payment of fees for games televised during the month of September. The second and third letters of credit were to serve as security for payment of fees for games televised during the months of October and November, respectively.

Debtor exercised its right to televise twelve (12) PAC–10 football games as contemplated by the agreement of August 13, 1984. The first game was televised on September 8, 1984. The remaining eleven (11) games were televised on the following ten (10) Saturdays.

On September 7, 1984, Mellon Bank ("Mellon") issued the first irrevocable standby letter of credit called for under the agreement dated August 13, 1984 in the amount of $1,000,000.00. It issued a sec-

ond letter of credit in the amount of $1,250,000.00 on September 28, 1984. The third letter of credit called for under the agreement was never issued.

On December 13, 1984, PAC–10 demanded payment from Mellon in the amount of $1,000,000.00 under the first letter of credit for games televised by Debtor during September of 1984. That same day, PAC–10 also demanded from Mellon payment in the amount of $750,000.00 under the second letter of credit for games televised on October 6, 1984 and October 13, 1984.

On December 18, 1984, Mellon made payments to PAC–10 totaling $1,750,000.00 under the letters of credit pursuant to PAC–10's two (2) demands on December 13, 1984.

Also on December 18, 1984, Debtor executed and delivered to Mellon a promissory note in the amount of $1,750,00.00. This amount was credited to Debtor's account at Mellon that same day. The funds were immediately deducted from the account in connection with the payments by Mellon to PAC–10 that same day under the letters of credit.

On December 20, 1984, PAC–10 demanded payment from Mellon in the amount of $250,000.00 under the second letter of credit for the game televised on October 20, 1984.

On December 24th or 26th of 1984, Mellon paid PAC–10 $250,000.00 under the second letter of credit pursuant to PAC–10's demand of October 20, 1984.

On December 27, 1984, PAC–10 demanded payment from Mellon in the amount of $250,000.00 under the second letter of credit for the game televised on October 27, 1984.

On January 2, 1985, Mellon paid PAC–10 $250,000.00 under the second letter of credit pursuant to PAC–10's demand of December 27, 1984.

Finally, on March 15, 1985, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

## ANALYSIS

Debtor seeks to avoid the above payments to PAC–10 pursuant to the agreement dated August 13, 1984 as preferential transfers under 11 U.S.C. § 547(b). Debtor can avoid the above payments to PAC–10 under § 547(b) only if it can establish the following:

(1) that a transfer of Debtor's property occurred;

(2) to or for the benefit of a creditor;

(3) for or on account of an antecedent debt owed by Debtor before the transfer was made;

(4) made while Debtor was insolvent;

(5) made on or within 90 days before the date of the filing of the petition, or between ninety (90) days and one (1) year before the date of the filing of the petition if the creditor is an insider; and

(6) the transfer enables the creditor to receive more than such creditor would receive if:

(i) the case were brought under Chapter 7 of the Bankruptcy Code;

(ii) the transfer had not been made; and

(iii) such creditor received payment of such debt to the extent provided by the Bankruptcy Code.

*See In re Hartley,* 825 F.2d 1067, 1069 (6th Cir.1987).

Section 547(b) is intended, among other things, to facilitate equality of distribution among creditors and to deter a "race of diligence" by creditors to dismember a debtor prior to bankruptcy. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 6138.

■ Debtor has the burden of proving the avoidability of a transfer under § 547(b). *See* 11 U.S.C. § 547(g). It is presumed that Debtor was insolvent during the 90–day period immediately preceding the filing of its bankruptcy petition. *See* 11 U.S.C. § 547(f).

### A. *Transfer of Debtor's Property*

■ Debtor has failed to establish that any property belonging to it was transferred in connection with the above payments to PAC–10. To the contrary, the evidence presented affirmatively establishes that no

transfer involving *Debtor's* property took place. The payments to PAC–10 were not made with funds in which Debtor had a property interest. Rather, PAC–10 was paid pursuant to the letters of credit issued by Mellon on September 7th and 24th of 1984, with funds belonging *to Mellon.* A letter of credit and the proceeds derived therefrom are *not* property of a debtor's estate for purposes of § 541 and 547(b). When the issuer of a letter of credit honors a proper draft under it, the issuer does so from its own funds, not from the assets of the customer who caused the letter of credit to be issued. *In re W.L. Mead, Inc.,* 42 B.R. 57, 60 (Bankr.S.D.Ohio 1984); *In re M.J. Sales & Distributing Co., Inc.,* 25 B.R. 608, 614 (Bankr.S.D.N.Y.1982).

■ The determination that there was no direct transfer to PAC–10 of property in which Debtor had an interest is not the end of the matter. It remains to be determined whether there was an "indirect transfer" to PAC–10 of property in which Debtor had an interest.

A transfer need not be made directly from a debtor to a creditor in order for it to be preferential:

If the bankrupt has made a transfer of his property, the *effect* of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it. (Emphasis added.)

*National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912).

■ Federal courts, in endeavoring to prevent such circuity, have broken certain singular transactions into two conceptually distinct transfers, one direct and one indirect. A direct transfer by a debtor to a third party who in turn satisfies a debt belonging to the debtor *may* withstand a preference attack against the immediate transferee. The indirect transfer arising therefrom, even though it arises from the same transaction by the debtor, *may* constitute a voidable preference as to the creditor who indirectly benefitted from the direct transfer to the third party. *Matter of Compton Corp.,* 831 F.2d 586, 592 (5th

Cir.1987), *modified on other grounds,* 835 F.2d 584 (5th Cir.1988).

The expansive definition of "transfer" set forth in the Bankruptcy Code implicitly embraces this distinction. *Id.* "Transfer" includes:

... every mode, direct or *indirect,* ... of disposing of or parting with property or with an interest in property ... (Emphasis added.)

11 U.S.C. § 101(50).

■ When a debtor pledges any of its assets to a third party as collateral in exchange for issuance by the third party of a letter of credit for the benefit of debtor's creditor, an *in*direct transfer of debtor's property for the benefit of a creditor is deemed to have occurred for purposes of § 547(b). Although the letter of credit and the payments made therefrom may not be property of the debtor, the collateral pledged by the debtor as security for the letter of credit is estate property. *Matter of Compton Corp.,* 831 F.2d at 590–91. If Debtor granted a valid security interest in its property to Mellon in exchange for the issuance of the letters of credit, then payment thereon could be an indirect transfer and a preference to the PAC–10.

It is undisputed that Mellon issued two (2) letters of credit for the benefit of PAC–10. Debtor failed to offer any evidence *in this case* that it transferred any of its property to Mellon as security for Mellon's issuing the letters of credit. Specifically, Debtor has failed to show that it executed any security agreement in connection with the letters of credit whereby it granted Mellon a security interest in Debtor's property.

Debtor obviously is relying on findings previously made by this Court in *Mellon Bank, N.A. v. Metro Communications, Inc. and The Pacific–10 Conference v. The Committee of Unsecured Creditors (In re Metro Communications, Inc.),* 95 B.R. 921 (Bankr.W.D.Pa.1989) (hereinafter *"Metro I").*

The Court found in *Metro I* that:

(a) Debtor had executed a line of credit agreement with Mellon on April 6, 1984, for which Debtor pledged all of

its present and future assets as security;

(b) Debtor and Mellon had executed a letter of credit agreement to finance Debtor's purchase of football broadcast rights for PAC–10 for the 1984 season;

(c) draws upon these letters of credit created a demand loan between Mellon and Debtor; and

(d) this loan was also secured by the security agreement previously executed on April 6, 1984.

*Metro I,* 95 B.R. at 924.

These prior determinations are binding and may be asserted by Debtor as against PAC–10 in the present case. PAC–10 is collaterally estopped from denying these determinations.

▮ Under the doctrine of collateral estoppel, a court's decision on an issue of fact or law necessary to its judgment may preclude re-litigation of that same issue in a suit on a different cause of action involving a party to the prior case. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).

▮ The following requirements must be satisfied in order for collateral estoppel to apply in a case:

(1) an issue decided in prior litigation is identical to the issue in a subsequent proceeding;

(2) the prior litigation resulted in a final judgment on the merits;

(3) the party against whom the estoppel is asserted was a party, or was in privity to the prior proceeding; and

(4) the opportunity to present the claim in the prior proceedings was full and fair.

*Amalgamated Cotton Garment v. J.B.C. Co. of Madera,* 608 F.Supp. 158, 162–63 (W.D.Pa.1984) (*citing Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 844 (3rd Cir.1974).

All of these requirements have been satisfied in this instance. The issue as to whether Debtor had granted Mellon a security interest in its property in connection with the letters of credit was raised in *Metro I.* This Court's determination as to

this issue was essential to the final judgment rendered therein. In addition, PAC–10 was a named party to *Metro I* and had full and fair opportunity to litigate the issue.

These prior findings of fact and law, as well as the final determination, rather than supporting Debtor's claim against PAC–10, indicate that its claim must fail. They compel the conclusion that there was no transfer of Debtor's property to Mellon in connection with the issuance of the letters of credit.

It was also determined in *Metro I* that:

(a) on April 5, 1984, Mellon filed UCC–1 financing statements in the appropriate state and local offices in Maryland (at that time the location of Debtor's chief executive office), 95 B.R. at 924;

(b) at some time prior to October of 1984 (most probably by late-August of 1984) Debtor had moved its chief executive office from Rockville, Maryland, to Pittsburgh, Pennsylvania, 95 B.R. at 929;

(c) Mellon filed the required financing statements in Pennsylvania on February 1, 4, and 5 of 1984, *Id.;*

(d) said filings at best *re*-perfected its security interest, *Id.;*

(e) Mellon's re-perfection, since it constituted a transfer of Debtor's property within 90 days of the filing of Debtor's bankruptcy petition, was avoided, 95 B.R. at 923–30; and

(f) Mellon consequently *did not have a valid security interest in Debtor's property,* 95 B.R. at 934.

Debtor is *judicially* (as opposed to collaterally) estopped from denying these determinations. In particular, Debtor is judicially estopped from denying *in this case* that the security interest it had granted to Mellon in connection with the letters of credit constituted a preference and, hence, was invalid.

▮ The doctrine of judicial estoppel serves to preclude a party from assuming a position in a legal proceeding which is inconsistent with one previously assumed by

it. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3rd Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). In essence, the doctrine of judicial estoppel provides that a party who has asserted a position may not later on be heard to contradict himself in order to establish an inconsistent position. *National Union Electric Corp. v. Matsushita Electric Industrial*, 498 F.Supp. 991, 1012 (E.D.Pa.1980). That party may be precluded (or estopped) from asserting the inconsistent position in the later proceeding. *Erie Telecommunications, Inc. v. City of Erie*, 659 F.Supp. 580, 588 (W.D.Pa. 1987); *Wade v. Woodings–Verona Tool Works, Inc.*, 469 F.Supp. 465, 476 (W.D.Pa. 1979).

Judicial estoppel is designed to prevent a party from playing "fast and loose" with the judiciary. *Lawrence v. United States of America, I.C.C.*, 629 F.Supp. 819, 822 (E.D.Pa.1985). It is meant to protect the judiciary, as an institution, from perversion of its process. *Edward v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir.1982).

■ A party who has gained an *advantage* by characterizing the law or the facts in a case will not be permitted later on to contradict that characterization in order to gain further advantage. *U.S. v. Kepner*, 843 F.2d 755, 760 (3rd Cir.1988) (*citing Scarano v. Central R.R.*, 203 F.2d 510, 513 (3rd Cir.1953)).

■ The doctrine of judicial estoppel applies only where a party has *successfully* asserted an inconsistent position in a prior proceeding. *City of Kingsport v. Steel & Roof Structures, Inc.*, 500 F.2d 617, 620 (6th Cir.1974). That party must have been successful in persuading the court to accept its position in the prior proceeding. "Acceptance" in this context requires only that the court have adopted that position, either as a preliminary matter or as part of a final disposition. *Edward*, 690 F.2d at 599, n. 5.

■ Judicial estoppel also serves to preclude a party from *abandoning* a position taken previously by it. If a party prevails in Suit # 1 by representing that proposition A is true, that party is stuck with proposition A in any later litigation involving proposition A. *Eagle Foundation, Inc. v. Dole*, 813 F.2d 798, 810 (7th Cir.1987).

■ Judicial estoppel applies to Debtor in the present case with respect to whether or not Mellon had a valid security interest in Debtor's property in connection with the letters of credit. Debtor successfully urged upon this Court in *Metro I* the proposition that Mellon's security interest was avoidable because it constituted a preferential transfer. Judgment was entered in Debtor's favor on this basis. Were Debtor to maintain in this case that Mellon did have a valid security interest after all, this would contradict its earlier successful position and would amount to playing "fast and loose" with the judicial process. Debtor cannot have both its cake and eat it in this regard. Consequently, it is judicially estopped from denying in this case that Mellon's security interest was invalid.

■ Since Mellon had no valid security interest in Debtor's property as the result of the security agreement dated April 6, 1984, it follows as a conclusion of law that no "indirect transfer" of Debtor's property thereby took place in connection with Mellon's issuing the letters of credit to PAC–10. A voided security interest is equivalent to no security interest at all.

Although there is no express statutory requirement that there occur a diminution of the bankruptcy estate in order for there to be an avoidable preference, such a requirement nonetheless is implicit. *Palmer v. RCA*, 453 F.2d 1133, 1135 (5th Cir.1971). It is an essential element of a voidable preference that "... it depletes the bankrupt's estate available to remaining creditors". *Virginia National Bank v. Woodson*, 329 F.2d 836, 839 (4th Cir.1964).

There being no transfer of Debtor's property to Mellon in connection with the issuing of the letters of credit, there was no diminution of Debtor's bankruptcy estate and, hence, no voidable preference.

### B. *Transfer Within Ninety Days of Bankruptcy Filing*

As has been indicated, Debtor filed a voluntary Chapter 11 petition on March 15, 1985. Debtor is a corporation. PAC–10

does not qualify as an insider of Debtor. *See* 11 U.S.C. § 101(30)(B). Therefore, even assuming that Debtor transferred any of its property to Mellon in connection with the letters of credit, said transfer must have occurred on or within ninety (90) days of the filing of the bankruptcy petition—i.e. by no later than December 15, 1984—in order for a preference to have taken place.

Any transfer of Debtor's property that might have taken place in connection with the letters of credit occurred *prior* to December 15, 1984.

 Debtor apparently relies on the fact that the payments by Mellon to PAC–10, in accordance with the letters of credit, were made on December 18, 1984 ($1,750,-000.00), December 24th or 26th of 1984 ($250,000.00), and January 2, 1985 ($250,-000.00), all of which payments were made within the required 90–day period. Its reliance upon these dates and transfers is misplaced. These payments were made by Mellon, not by Debtor. Such transfers were made from Mellon's, not Debtor's, assets. *W.L. Mead, Inc.*, 42 B.R. at 60; *In re M.J. Sales & Distributing Co., Inc.*, 25 B.R. at 614. In a letter of credit transaction, the transfer of *debtor's* property occurs when the letter of credit is issued and received by the beneficiary, not when the issuer pays on the letter of credit. *Matter of Compton*, 831 F.2d at 591 (citations omitted). Thus, the fact that payments to PAC–10 were made within ninety (90) days of the filing of the petition is irrelevant.

The letters of credit were issued by Mellon on September 7, 1984, and September 28, 1984, and presumably were received by PAC–10 shortly thereafter. These events occurred almost 180 days prior to the filing of the bankruptcy petition, well beyond the required 90–day period.

PAC–10 has raised other matters in defending against Debtor's claim. For instance, PAC–10 argues that the payments to it were part of a contemporaneous exchange for new value and, pursuant to 11 U.S.C. § 547(c)(1), are not subject to avoidance. It will not be necessary for the Court to address this contention in light of the determination that Debtor has failed to establish that a transfer of its property for the benefit of PAC–10 ever took place and that any transfer which might have taken place occurred within ninety (90) days of the filing of the bankruptcy petition.

An appropriate Order will be issued.