**In re WOOLLEY'S PARKWAY CENTER, INC. Debtor.**

**Bankruptcy No. 91–12510–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 24, 1992.

Jeffrey W. Warren, Tampa, FL, for debtor.

John D. Goldsmith, Tampa, FL, for Mellon Bank.

Larry M. Foyle, Kenneth Turkel, Tampa, FL, for Parkway Center Community Development Dist.

John D. Emmanuel, Tampa, FL, for Fowler, White, et al.

Elizabeth Rice, Tampa, FL, for Ausec & Cheney Group.

Christopher Nolland, Dallas, TX, for Bickel & Brewer.

Samuel J. Zusmann, Jr., Orlando, FL, for Allstate Ins. Co.

## ORDER ON OBJECTION TO CONFIRMATION, OBJECTION TO CLAIMS IN CLASS 4 FILED BY MELLON BANK, N.A., MOTION TO ALLOW CLAIMS FOR THE PURPOSE OF VOTING

ALEXANDER L. PASKAY, Chief Judge.

As one who has presided over thousands of cases over the years involving Debtors who sought refuge in the Bankruptcy Court not only under the rehabilitative provisions of the Bankruptcy Code, but also under the Bankruptcy Act of 1898, this Court has never encountered and has never been faced with a more bizarre and unorthodox reorganization case as the one involving Woolley's Parkway Center, Inc. (Debtor) who filed its Petition for Relief under Chapter 11 of the Bankruptcy Code on September 30, 1991.

The procedural background preceding the immediate matters under consideration is highly contested and complex and, therefore, it would be helpful to set forth specific and detailed facts relevant in order to put the matters into proper focus.

The Debtor is a Florida corporation and is the owner of a large tract of land located in the Northwest corner of Hillsborough County, Florida. The property is generally referred to as "Parkway Center". The property was acquired by the Debtor on April 15, 1985. The purchase was financed by a loan obtained by the Debtor from Florida National Bank and which was later assigned to Mellon Bank, N.A. (Mellon). The original loan granted by Florida National Bank was in the amount of $6.2 million and was secured by a first mortgage encumbering the subject property. However, the Debtor received numerous advances on the note bringing its total indebtedness to $19.3 million as of March 27, 1990. The loan was also personally guaranteed by Mr. Robert Woolley (Woolley), the president and initially 100% holder of all outstanding shares issued by the Debtor, and later at the time of the commencement of this Chapter 11 case, 85% holder of all outstanding shares issued by the Debtor.

The property acquired by the Debtor was to be developed as an industrial park. In order to assist the development, the Debtor successfully obtained passage of a Statute from the Florida Legislature which authorized the creation of the Parkway Center Community Development District (CDD) pursuant to Chapter 190 of the *Fla.Stat.* as amended (1991). Pursuant to the authority granted by the Statute, CDD issued bonds in the total amount of $21.5 million. The bonds were acquired by an entity known as Allstate, a for-profit organization. The proceeds of the bond sales which were to be used for the improvements of the industrial park are currently held by CDD in escrow.

On September 30, 1991, the Debtor filed its Petition for Relief under Chapter 11 of the Bankruptcy Code. In its list of 20 largest unsecured creditors (Form 4), the Debtor scheduled 12 unsecured creditors, including Mellon as an unsecured creditor holding a claim in the amount of $156,718.77. Shortly after the commencement of this Chapter 11 case, Mellon filed a Motion to Lift the Automatic Stay or in the Alternative, a Motion for Adequate Protection. The final evidentiary hearing on Mellon's Motion was held on December 4, 1991. At the conclusion of the hearing, this Court

entered an order and directed the Debtor to furnish adequate protection to Mellon by commencing to make payments to Mellon in January, 1992 in the amount of $300,-000.00 per month. The Order for Adequate Protection was based on the uncontested position urged by Mellon that it was fully secured.

In addition, on January 14, 1992 this Court also entered an Order on Motion To Determine Secured Status and determined that Mellon was fully secured, albeit at no time did this Court actually determine the precise value of Mellon's collateral, the industrial park. Unfortunately, the entry of the Order on Mellon's motion immediately triggered a bitter series of salvos and counter-salvos by each, concerning the appropriate language which should be included in the order. This tug-of-war was centered around the language which determined inter alia that:

> The Motion to Determine Secured Status is granted *without prejudice to the rights of any of the parties to argue in this or any other proceeding a different value* and this Order Determining Secured Status shall not be construed to operate as collateral estoppel, *res judicata*, admission against interest or issue preclusion on the issue of valuation in this or any other proceeding. (emphasis added)

The controversy was finally settled with an order entered on September 1, 1992 on Mellon's Motion to Determine the Secured Status.

The Debtor, rather than comply with the adequate protection order, filed its first Plan of Reorganization on January 15, 1992. The Plan proposed to convey the industrial park owned by the Debtor to Mellon in full satisfaction of its claim and proposed to pay a 100% dividend to all allowed unsecured claims. Needless to say Mellon wants no part of this deal and wasted no time in rejecting this terrific opportunity to become the owner of a tract of land nobody wanted.

However, when it became apparent that the Debtor would have a serious problem with Mellon, and when it realized that it would not be able to obtain confirmation without the requisite acceptances by at least one impaired class, the Debtor filed its Second Plan on June 25, 1992 which reduced the dividend to non-insider unsecured creditors to 95 cents on the dollar, thus creating the impaired class needed for confirmation. At this point it appeared that there were no further obstacles to confirmation of the Debtor's Plan in light of the fact that the Debtor now technically had the majority of acceptances in number and in amount of the allowed unsecured claims in this newly created "impaired class."

The Second Plan of the Debtor proposed to deal with Mellon the same way as in the First Plan, i.e., proposed a conveyance of the industrial park to Mellon in full satisfaction of its claim. In this connection it is important to note that Mellon had already sued Woolley on his guarantee in the U.S. District Court for the Northern District of Texas, which suit is still pending. It takes no great imagination to conclude that if the Debtor's Second Plan is confirmed, Mr. Woolley will be off the hook on his guarantee. This is so because a conveyance of the industrial park under the confirmed Plan in full satisfaction of Mellon's claim would wipe out the primary obligation of the Debtor and in turn, also the secondary obligation of Mr. Woolley based on his guarantee of the corporate debt.

However, the planned smooth sailing toward confirmation by the Debtor became suddenly derailed by the unexpected development which occurred on May 15, 1992, when Mellon itself filed its own Plan of Reorganization. Mellon proposed to pay under its Plan a 100% dividend on all non-insider unsecured allowed claims; proposed to transfer ownership of the industrial park to Allstate/CDD (sic) and in exchange it would receive the Debtor's interest in a $2 Million CD (sic) currently claimed to be property of the estate of the Debtor and in addition, it would receive its "cash collateral" (sic), i.e., the proceeds of the bond sales from CDD/Allstate or from the proceeds from the sale of the industrial park if and when it was sold, if ever, by Allstate.

The Second Plan of Mellon filed on July 6, 1992 did not change the provision dealing with the non-insider unsecured creditors. It again provided that the claim of Mellon would be paid out of the $2 Million CD and from the "cash collateral" (sic) currently held in escrow by CDD, which could be turned over by CDD/Allstate to Mellon. Actually Mellon's Plan offers two options. The first calls for conveyance of the industrial park (which Allstate does not want) to Allstate, and in exchange, Allstate/CDD would be required to turn over the funds currently held by CDD in escrow funds obtained from sale of the bonds. The second option of Mellon's Plan contemplates the appointment of a liquidating trustee who would sell the industrial park free and clear of the lien of CDD to a third party for an unspecified amount on an unspecified date and under unspecified conditions to a buyer yet to be found who is actually willing and able to buy the real property which nobody wants.

In this connection, it should also be pointed out that the lien of CDD is, as a matter of law, equal in rank to tax liens which, of course, are superior to any contractual liens, and cannot be avoided and must be paid in full.

On July 29, 1992, this Court approved the Debtor's last disclosure statement, and fixed the bar date for filing proofs of claims and to cast ballots on the Debtor's Second Amended Plan. The confirmation hearing was scheduled to be held on September 15, 1992. To no one's surprise Mellon filed an Objection to the Debtor's Second Amended Plan and most importantly, timely filed an unsecured claim in the amount of $156,718.77 and, of course, voted against the Plan.

Obviously, this development would have dealt a fatal blow to the Debtor's attempt to obtain confirmation if the claim of Mellon and its ballot is recognized. This is so because in this instance the Debtor would not have had the requisite majority of the amount of votes in the class of unsecured claims and, in turn, the Debtor would not have the acceptance of at least one impaired class, a class which was previously unimpaired but cleverly redone to make it an impaired class. To further muddy the water, Mellon filed an objection to the allowance and a right to vote of all unsecured creditors in this newly-created impaired class with the exception of one creditor who voted against the Plan. In light of this development it is evident that until these newly-raised issues are resolved it is impossible for this Court to consider the confirmation of the Debtor's Plan.

This is the procedural background of this convoluted Chapter 11 case. The matters under consideration by this Court are: 1) a Motion to Temporarily Allow Claims for the Purpose of Voting filed by the Debtor; 2) the Objection to the Allowance of Claims of Unsecured Creditors in Class 4 who voted for the Debtor's Plan; and 3) Mellon's Objection to Confirmation of the Debtor's Plan. The claims challenged by Mellon were filed by King Engineering Associates, Inc.; Ausec & Cheney Group; Atlanta Testing; the law firm of Fowler, White, et al.; Bowne of Dallas and the law firm of Akin, Gump, et al. The Objections filed by Mellon are non-specific and basically seek a disallowance of these claims on the grounds that these creditors may have received a preference or their claims might be subject to setoff, one of which actually filed a proof of claim, but they were scheduled not as disputed, contingent, or unliquidated, therefore, their claims are deemed to have been filed and must be recognized by virtue of § 502(2) of the Bankruptcy Code and F.R.B.P. 3003(b)(1) unless they are disallowed. In this connection, it should also be pointed out that under the same Rule the claims deemed to have been filed constitute a prima facie evidence of the validity and the amount of such claims.

Even a cursory analysis of the procedural background of this Chapter 11 case leaves no doubt that the only reason that Mellon belatedly filed the Objections to these claims, after these creditors voted in favor of the Debtor's Plan, was to disenfranchise these creditors and to prevent the Debtor from obtaining confirmation of its Plan on the grounds that the Debtor has not been able to obtain the acceptance of its Plan by at least one impaired class,

which of course, is a condition precedent to confirmation by virtue of § 1129(a)(10) of the Bankruptcy Code.

■ To resolve these Objections, it is necessary to look at first the legal sufficiency of the Objections. Concerning the claims of King Engineering, Atlanta Testing, Bowne of Dallas, and Akin, Gump, the contention that these claims should be disallowed because these creditors might have received a preference and/or their claims might be subject to a setoff, is legally insufficient to overcome the prima facie validity of these claims.

While it is true that by virtue of § 502(d), the creditors who received a preference may not have their claims allowed unless they surrender the preference, the mere allegation in an Objection that a creditor might have received a preference or a debtor might have a right of setoff is insufficient as a matter of law for disallowance of any claim based on a voidable preference pursuant to § 547 of the Bankruptcy Code. Such claim must be asserted if it is used as part of an objection to a claim by way of a Counterclaim; and if it is asserted offensively seeking affirmative recovery the Debtor must file a complaint pursuant to F.R.B.P. 7003. Both proceedings are governed by part VII of the Rules. Obviously, the claims challenged by Mellon cannot be disallowed on the grounds urged by Mellon until it is determined that a creditor in question whose claim is challenged, in fact, received a preference and refused to surrender and turn back to the estate the property which is the subject of the preference. Moreover, this belated attack on the allowability of these claims of Mellon is way too late, and in fairness should not be recognized at this late stage of the proceedings.

For the reasons stated this Court is satisfied that the Debtor's Motion to Temporarily Allow Claims for the Purpose of Voting is well taken and the Mellon Bank's Objection to the claims of King Engineering, Atlanta Testing, Bowne of Dallas and Akin, Gump shall be overruled. Mellon's Objection to the claim of Ausec & Cheney Group shall be sustained in part and shall be allowed in a reduced amount and the Objection to the claim of Fowler White, if it is still relevant, shall be scheduled for final evidentiary hearing by a separate order, if necessary.

Having concluded the Objections to the Claims in the unsecured class of the Debtor's Plan filed by Mellon are without merit, and the ballots cast by these creditors are valid and should be counted, it follows that the allowance or disallowance of Mellon's unsecured claim is crucial to make or break the Debtor's Plan and its ability to obtain confirmation of same. This is so because if the unsecured claim of Mellon is allowed and Mellon is permitted to vote same, it will control the vote in the unsecured class, having the majority of the amount of claims in that class, and consequently the Plan of the Debtor cannot be confirmed over the negative vote of Mellon by virtue of § 1129(a)(10) of the Bankruptcy Code. Having realized the crucial and the devastating impact of Mellon's unsecured claim on its Plan, the Debtor now contends that Mellon is judicially estopped to assert an unsecured claim and to vote the same.

This proposition urged by the Debtor is based on the undisputed fact that, as noted earlier, on November 8, 1991, Mellon filed a Motion and sought relief from the automatic stay or in the alternative, adequate protection—according to the Debtor that in its Motion Mellon claimed to be fully secured; Mellon's Motion was heard and after an extensive evidentiary hearing on January 22, 1992, this Court entered an Order and denied Mellon's Motion to Lift the Stay but granted its request for adequate protection and ordered the Debtor to furnish adequate protection by paying to Mellon $300,000.00 per month beginning January, 1992. The amount fixed included monthly escrow for taxes. The Order which was ultimately signed after several revisions, did not fix the actual value of the real property but determined that Mellon was fully secured.

Based on the record, especially based on the testimony during the hearing on Mellon's Motion to Lift the Stay and in the Alternative for Adequate Protection, it is without dispute that counsel for Mellon

consistently took the position that it was fully secured in late 1991, a proposition which was not challenged by the Debtor. Based on these undisputed facts the Debtor contends that Mellon is judicially estopped to claim now that it is unsecured and therefore, is not entitled to have an unsecured claim allowed and to vote its claim.

### Doctrine of Judicial Estoppel

 The doctrine of judicial estoppel, not to be confused with the doctrine of *res judicata* or *collateral estoppel*, prevents a party from successfully asserting one position to its own advantage, obtaining relief from a court based on that position, and then subsequently assuming a contradictory position for its further advantage. Judicial estoppel prohibits a party from playing "fast and loose" with the judicial system. *In re Metro Communications, Inc.*, 115 B.R. 849, 856 (Bankr.W.D.Pa.1990); *In re Gaye–Joy Corp., Inc.*, 84 B.R. 235, 237 (Bankr.M.D.Fla.1988) (observing that the doctrine of judicial estoppel prevents a party from playing "fast and loose" with the courts and holding that individual principals were judicially estopped from asserting that corporate debtor owned horses where they had successfully claimed personal ownership in related proceeding in federal district court). Put bluntly, a party may not be allowed to successfully assert one position, and prevail with the court, and then take a contrary position that better serves its current motives. *See Bregman v. Alderman*, 955 F.2d 660, 664 n. 3 (11th Cir.1992) (observing that judicial estoppel prevents party from asserting proposition in present proceeding due to having taken contrary position previously).

The Eleventh Circuit recently stated that the doctrine of judicial estoppel is directed against those who attempt to manipulate the court system by taking a divergent position after successfully asserting an inconsistent position. *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1261 (11th Cir. 1988) (affirming bankruptcy court's finding that debtor was judicially estopped from disavowing participation in dealership when former successful assertion of substantial participation now worked to his detriment).

 These general statements of the law on judicial estoppel, while supported by logic and by respectable authorities, unfortunately for the Debtor, have no relevance and applicability to valuation of property in a case under Title 11, for the following reasons:

First, it is quite common that immediately after the commencement of a Chapter 11 case the secured creditors, like Mellon in this instance, file a Motion and seek adequate protection. In this context, the secured party must show that it is fully secured because an undersecured creditor is not entitled to adequate protection unless it is able to show decrease in value of its collateral, i.e., economic depreciation of the property, caused by the passage of time. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Second, it is equally possible and not unlikely that the secured creditors might very well have been fully secured creditors at the initial stage of the Chapter 11 case, thus entitled to adequate protection, but may very well have become grossly undersecured at the time the case ultimately reached the confirmation stage, and by the time proof of claims had to be filed.

Third, § 506 clearly permits bifurcation of a secured claim into a secured and an unsecured portion. In addition, the Section also provides that "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or *on a plan* affecting such creditor's interest." (emphasis supplied).

 This is what occurred in the present instance. The Debtor failed to comply with the adequate protection order entered in January, 1992, which determined the balance owed on Mellon's mortgage to be more than $3 Million. In addition, the property is further encumbered by unpaid real estate taxes in excess of $2 Million and a lien held by CDD in excess of $21.5 Million, both of which are prior in rank to

the mortgage lien of Mellon. To accept the proposition that a valuation at the beginning of a case is cast in concrete and is the law of the case for all purposes not only defies logic but is clearly contrary to the specific language of § 506 of the Code.

■ For several additional reasons, the Debtor's assertion that Mellon is judicially estopped from arguing a different valuation at confirmation must fail. First, both Debtor's counsel and counsel for Woolley argued at the September 15, 1992 hearing that the valuation of the property for purposes of confirming the Plan of Reorganization should be determined as of the date the Chapter 11 petition was filed. Such a position is wholly unsupported by law, and this Court is unwilling to accept the proposition urged by the Debtor that the valuation of the Debtor's property for the purpose of confirming a Plan of Reorganization should be determined with reference to the date of the commencement of the case. *Bates v. Cook, Inc.*, 615 F.Supp. 662, 672–73 (M.D.Fla.1984); *FDIC v. Berry*, 659 F.Supp. 1475, 1486 (E.D.Tenn.1987). As stated in *In re Briggs Transportation Company*, 780 F.2d 1339, 1349 (8th Cir. 1985):

> "A value determination for automatic stay purposes is not necessarily the same as value determined for another purpose such as confirming a plan."

Recognizing that valuation determinations differ for different purposes the court in *Matter of Seip*, 116 B.R. 709, 711 (Bankr.Neb.1990) stated:

> If the amount of a secured creditor's allowed secured claim were to be conclusively determined by the value of collateral on the date the bankruptcy petition was filed, and such amount could not be redetermined during the course of the bankruptcy case, the language in § 506(a) would be rendered meaningless in the estate of confirmation proceedings. This is contrary to the overall statutory scheme.

■ Equally, the order on determination of secured status cannot bind Mellon for the purposes of confirmation. In *In re Palombo Farms of Colorado, Inc.*, 43 B.R. 709, 711 (Bankr.Colo.1984), the court in fact faced this precise issue and ruled that the valuation for the purpose of confirmation cannot, as a matter of law, be established until the confirmation hearing and the Order on Determination of Secured Status did not by its terms, and should not, bind Mellon for confirmation purposes.

Based on the foregoing, this Court is satisfied that the Debtor's challenge of the unsecured claim of Mellon is without merit and must be rejected. In light of the foregoing, it is unnecessary to consider Mellon's contention that the Debtor itself is judicially estopped to challenge Mellon's unsecured claim. This proposition is based on the undisputed fact that the Debtor's sworn statement listed 20 largest unsecured creditors which schedule included Mellon as one holding an unsecured claim in the amount of $156,718.77.

Having concluded that Mellon is entitled to have its unsecured claim considered and is permitted to vote same, it is evident that the Debtor's Plan cannot be confirmed for the simple reason that the Debtor does not have the requisite majority in amount of the one and only impaired class, which is a prerequisite for confirmation by virtue of § 1129(a)(10). While it is true that ordinarily the Debtor should be given the opportunity to challenge the allowance of Mellon's unsecured claim, in light of the additional grounds asserted by Mellon in its Objection to Confirmation, it may not be necessary.

■ First and foremost, Mellon contends that the Debtor's Plan was not proposed in good faith, therefore, it cannot be confirmed by virtue of § 1129(a)(3). Even a cursory analysis of this entire case and the Second Amended Plan leaves no doubt that the point urged by Mellon is well taken. It is beyond peradventure that the entire Plan of the Debtor was designed to achieve one purpose and one purpose only, which is to get the principal of the Debtor, Woolley, off the hook on his guarantee of the primary obligation of the Debtor, and to prevent Mellon from enforcing any claim against him on his guarantee. In an attempt to diffuse this damaging conclusion the Debtor points out that there is no provision in any of the Plans proposed by the Debtor in which the Debtor sought an in-

junction against Mellon, prohibiting Mellon to pursue its claim against Mr. Woolley on his guarantee. This protestation has a very hollow ring, indeed. This is so because there is obviously more than one way to skin a cat and one can achieve the same result under the Plan submitted by the Debtor, without seeking injunctive relief. This is so because if Mellon is compelled to accept the transfer of its collateral in full satisfaction of its claim under a confirmed Plan, Woolley would be furnished a complete defense, a defense even better than one obtained by injunction in a suit against him by Mellon on his guarantee, because the prime obligation of the Debtor is wiped out. This is so because under the confirmed Plan, through the conveyance of the industrial park to Mellon in full satisfaction of its claim, any obligation of Woolley based on his guarantee would also be wiped out.

Clearly, this not very well disguised goal sought to be achieved through Chapter 11 by the Debtor, has no resemblance to any legitimate goal which was envisioned by Congress when it crafted Chapter 11. To illustrate further the lack of good faith of the Debtor in proposing its Second Amended Plan, one need only consider the crass, not very subtle attempt to manipulate this Chapter by artificially creating an impaired class, once it became clear that in order to obtain confirmation it had to have the affirmative vote of at least one impaired class.

As noted earlier, Mellon filed its own Plan of Reorganization. Mellon's Plan is now scheduled for confirmation on November 25, 1992. Mellon's Disclosure Statement has been approved. Nothing stated in this Memorandum Opinion shall be construed to indicate that Mellon's Plan of Reorganization meets the standard for confirmation required by § 1129 of the Bankruptcy Code and this Court will make its determination after a presentation by Mellon in support of its Plan of Reorganization and after consideration of any objection to confirmation of Mellon's Plan which may be filed.

Based on the foregoing it is

ORDERED, ADJUDGED AND DECREED that the Objections to the allowed Claims of creditors in class 4 filed by Mellon be, and the same are hereby, overruled. It is further

ORDERED, ADJUDGED AND DECREED that the Motion to Temporarily Allow Claims for the Purpose of Voting filed by the Debtor be, and the same is hereby, granted and the affirmative votes cast in that class are to be considered for the purpose of voting. It is further

ORDERED, ADJUDGED AND DECREED that Mellon Bank, N.A. is not judicially estopped to assert an unsecured claim and vote same against the Debtor's Plan. It is further

ORDERED, ADJUDGED AND DECREED that Mellon's Objection to the Confirmation of the Debtor's Second Plan of Reorganization is sustained and confirmation of the Debtor's Second Plan of Reorganization is denied, based on the specific findings of this Court that the Second Amended Plan of the Debtor was not proposed in good faith pursuant to § 1129(a)(3) of the Bankruptcy Code, and based on the Debtor's inability to secure the requisite majority of affirmative votes of at least one impaired class pursuant to § 1129(a)(10) of the Bankruptcy Code.

DONE AND ORDERED.