## In re ALBRECHTS OHIO INNS, INC., Canter Inns, Inc., Debtors.

**Bankruptcy Nos. 1–91–05492, 1–91–05491.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

March 11, 1993.

---

Mark C. Bissinger, Cincinnati, OH, for debtor.

Robert A. Goering, Cincinnati, OH, for Canter Interests.

Jerome J. Metz, Jr., Cincinnati, OH, for Bank One, Portsmouth.

## DECISION ON CONFIRMATION

BURTON PERLMAN, Chief Judge.

Debtor Albrechts Ohio Inns, Inc. (hereafter "Albrechts") filed a Chapter 11 case in this court as did debtor Canter Inns, Inc. (hereafter "Canter"). Albrechts moved for the joint administration of the cases pursuant to Bankruptcy Rule 1015, in the memorandum accompanying its motion reciting that Albrechts owns 100% of the stock of Canter, the two entities therefore being related debtors. This motion was served upon the presently objecting creditors and their counsel, the notice accompanying the service advising recipients that they had 20 days to object. No objection was received, and the motion was granted. A joint disclosure statement and joint Chapter 11 plan were thereafter filed by debtor. The joint disclosure statement was approved by the court, and the plan came on for confirmation hearing. The confirmation hearing date was July 8, 1992, and objections to confirmation were to be filed by July 6, 1992. On July 6, 1992, certain individuals, William McKinley, Mary Purdy, C. Bruce Canter, John Purdy Caudill, Juanita Purdy, Lawrence Kimble, Bruce Canter, and Robert Kimble (hereafter collectively "objectors") filed objections. The objectors are virtually all of the creditors in Class VII in the plan. The objectors voted against confirmation of the plan. In view of this action by the objectors, an evidentiary hearing was subsequently held pursuant to 11 U.S.C. § 1129(b), for the purpose of determining whether the plan proposed was fair and equitable so that it could be confirmed despite the negative vote of Class VII.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(L).

A majority of the common stock of Albrechts (200 shares) is owned by a corporation, Downtown Hospitality, Inc. The remaining 150 shares of Albrechts common stock are owned by various individuals. All of the voting securities of Downtown Hospitality, Inc. are owned by Jeff Albrecht and his brother Gary Albrecht.

Downtown Hospitality, Inc. also owns and operates two restaurants in the Portsmouth–Wheelersburg area, Albrecht Fine Foods (Wheelersburg), and the Townhouse Restaurant (Portsmouth). Downtown Hospitality, Inc., Jeff Albrecht and Gary Albrecht are not in bankruptcy. Only two entities, Canter and Albrechts, are. Albrechts built and continues to operate a 62–room Days Inn in Wheelersburg, Ohio. In 1982, Albrechts, by stock purchase, acquired Canter from the objectors. Canter owned and operated a Ramada Inn in Portsmouth, Ohio. The purchase price for the stock of Canter was $1,800,000.00. As part of the purchase agreement, Albrechts also assumed approximately $1,282,000.00 in secured debt. The purchase agreement called for the $1,800,000.00 to be paid to the objectors in annual installments of $300,000.00, the first being due on closing. That $300,000.00 payment was the only one which was made in full.

A program of improvements in the Ramada Inn was undertaken in order to maintain the franchise. This consisted of the building of an indoor pool and edifice to house it. The cost of these improvements was approximately $1,100,000.00.

In the Albrechts' business operation, there is a third restaurant, the Nellie Peck, which is the name of the restaurant at the Ramada Inn. The Nellie Peck is operated by a separate corporation, the Nellie Peck Restaurant, Inc.

Jeff and Gary Albrecht have another corporation, the Hometown Management Co., Inc., also not in bankruptcy, which provides management services to all the restaurants and hotels in which they are interested. These various enterprises pay a management fee to Hometown. The only compensation received by Jeff and Gary is from Hometown. The Ramada Inn pays a management fee of $3,000.00 per month to Hometown; the Nellie Peck pays $1,000.00 per month to Hometown; and Days Inn pays $3,000.00 per month to Hometown. Jeff and Gary are each paid $4,000.00 per month from Hometown for their services.

The evidentiary record made at the hearing in this matter had for its purpose a tracing of the history of the respective debtors, and the involvement of Jeff Albrecht and Gary Albrecht with them. Along the way, the record discloses the additional business interests and entities with which Jeff and Gary Albrecht are involved, where their interests are not limited to the Days Inn, the operation identified with Albrechts, and the Ramada Inn, the operation identified with Canter. In addition, the record made by debtors was directed at valuation evidence of the Days Inn and the Ramada Inn. The case presented by the objectors had for its purpose the casting of doubt on the validity of the appraisals, because the appraisals were in the final analysis based upon information supplied to the appraisers by Jeff Albrecht.

Testifying for debtor at the hearing was Jeffrey P. Albrecht, president and treasurer of Albrechts. It became clear in the course of testimony that he and his brother Gary are the main players in regard to the affairs of both debtors here, as well as a number of other entities interrelated with the affairs of these debtors. Thus, a separate corporation, Southern Ohio Hospitality, Inc. owns the furniture and fixtures at the motels, as well as owning and operating a restaurant unassociated with either motel.

Jeffrey T. Albrecht was an accounting major at Ohio State University, and became a CPA in 1975. Jeffrey and his brother Gary had operated two restaurants in the Portsmouth vicinity. At some time prior to 1982, they secured a Days Inn franchise and built a Days Inn Motel in Wheelersburg, Ohio, such enterprise being the business activity of debtor Albrechts. In 1982, Jeffrey was approached by community leaders who asked him to take over the Ramada Inn, comprising the business of debtor Canter Inns. This approach was made because the Ramada Inn was about to lose its franchise for failure to measure up to the quality requirements of the franchisor. Jeffrey said that the persons who approached him were the community leaders who are the objectors in this case. The vehicle for acquisition of the Ramada Inn by Jeffrey and Gary was for the corpora-

tion which they controlled, Albrechts, to purchase the stock of debtor Canter Inns, Inc. This transaction was the subject of an agreement entered into December 29, 1981. The contract provided for an option period, and a purchase price of $1,800,000.00 in event the option was exercised. Payment was to be made $300,000.00 at the time of the exercise of the option, and $300,000.00 annually thereafter until 1987.

Following the purchase, the franchisor sent in an architect and informed the purchasers what was required in order to maintain the franchise. A program which took three years to accomplish was commenced. It involved the building of a swimming pool, new carpets, wallpaper, and beds throughout the motel.

The only $300,000.00 payment of the purchase price that was made was that made at the time of the original closing in 1982. In 1983, only $200,000.00 was paid, the other $100,000.00 being deferred. The source of the $200,000.00 paid was not from operations of the motel, but rather a loan from Civic Savings in exchange for which a second mortgage on the Ramada Inn was given. In 1984, $200,000.00 was paid on the $300,000.00 obligation. This money came from the cash flow of the business, together with money borrowed to complete renovation.

The deferral of $100,000.00 in 1983 and also in 1984 was authorized by an agreement between the parties entered into April 28, 1983. No fixed date for payment of the deferred amount was provided, but interest on all amounts deferred was provided. It had been a part of the transaction that the stock of Canter Inns was delivered not to the purchasers, but to an escrow. This was a provision of the December 29, 1981 agreement. The escrow held the stock as security for payment, and was to be released to an extent commensurate with payments received. This provision about delivery of stock was reinforced in the April 28, 1983 amendment, by the provision that no more than 49% of the total stock of the corporation was to be delivered to the buyer "so long as any deferral or interest ... remains unpaid."

In 1985, Jeffrey and Gary achieved a refinancing of mortgages on the Ramada Inn, there then being a first mortgage on the Ramada Inn to Freedom Federal Savings and Loan in the amount of $2,450,-000.00, and a second mortgage in the amount of $261,298.85 held by the Small Business Administration. At the time of the refinancing, the sellers and Albrechts entered into an agreement dated July 1, 1985. That agreement specified that the parties understood that $970,000.00 was still owed to the sellers in principal, together with $28,749.91 of accrued interest. In the April 1, 1985 agreement it was provided that accrued interest was to be paid upon execution of the agreement. Thereafter, interest only was payable on the principal obligation, and the principal obligation itself would be paid "in annual payments by that amount equal to 50% of the 'net cash flow' of the Company." The entire amount of the principal obligation was specified to be due and payable on the first day of July, 1992, if not paid sooner. The April 1, 1985 agreement modified the escrow agreement to require that sufficient shares be released from the escrow agreement so that the buyer (Albrechts) thereafter would hold free of the escrow no less than 39% of the outstanding common shares. The agreement then went on to provide that until payment was made in full the buyer (Albrechts) would not hold more than 49% of the total shares of the company.

In 1985, Albrechts was unable to keep current on all debt obligations as well as tax payments and consequently began not to make trust fund payments on taxes. Also beginning in 1985, Jeffrey began personally to manage the Ramada Inn. The failure to make trust fund tax payments presented a problem which had to be dealt with. To do so, Albrechts reached an agreement with the State of Ohio to make monthly payments during 1988 to 1990. To make this possible, Albrechts reached an agreement with lenders to require payment of only 9% interest for a period of 18 months. Albrechts was unable to make payments to the sellers in addition to these obligations.

Upon finding this to be the case, Jeffrey commenced negotiation with the seller group for further concessions by the sellers. The negotiations proved unfruitful, and ultimately occasioned the present bankruptcy filings. That it is entirely because of the indebtedness to the sellers that these bankruptcy cases were filed is apparent from an examination of the schedules which were filed. (We take judicial notice of those documents.) In the schedules for debtor Canter Inns, Inc., two secured creditors are listed, Freedom Federal Savings and Loan for a first mortgage of $2,450,-000.00, and the Small Business Administration for a second mortgage in the amount of $261,298.85. In the schedules for debtor Albrechts Ohio Inns, Inc., there is a first mortgage to Bank One in the amount of $496,853.30; a second mortgage to Star Bank in the amount of $292,329.76; a third mortgage to SBA in the amount of $261,-298.85, the last mentioned loan also being collateralized by the personal property and receivables at the Days Inn. The only unsecured creditors listed in the Albrechts case are the 11 parties who are the sellers of stock of Canter Inns, Inc. to Albrechts. No trade creditors are listed.

On cross-examination, it was developed that a $100,000.00 sales tax lien was cancelled in June, 1992. This had been paid over a period of time with final payment made in approximately October, 1991. Albrechts had paid this off at the rate of $13,000.00 per month for about a year.

Jeffrey Albrecht testified that he thought that the price paid for the Ramada Inn was fair at the time of the purchase. It turned out to be too much, he said, because the Ramada Inn did not produce enough cash flow to pay off the purchase price.

So, as we have seen, Jeffrey and Gary Albrecht, or, perhaps Albrechts Ohio Inns, Inc., being faced with the obligation to complete payment of the purchase price to the sellers by July 1, 1992, and having failed to negotiate an alternative arrangement with the sellers, filed these Chapter 11 bankruptcy cases. In very short order, debtors filed disclosure statements and plans. The plan classifies the allowed secured claims of Freedom Federal Savings and Loan (now taken over by the Resolution Trust Corporation) as Class III, an impaired class. Debtors have negotiated a concession from this creditor that the adjustable rate note which had been given the creditor shall be modified to put a cap on interest rate at 9.375%. Otherwise, this creditor will continue to receive its monthly payments from Canter Inns, Inc., its obligation at the time of the plan being current. Class IV deals with creditor Bank One, Portsmouth, N.A., the class being impaired. The treatment of this creditor in Class IV represents a negotiated arrangement whereby Albrechts will make interest-only payments for 15 months following confirmation. The claim of Star Bank is Class V which has also agreed to interest-only payments for a period of 15 months after confirmation. The third secured creditor of Albrechts, the Small Business Administration, is Class VI which is not impaired.

The allowed unsecured claims, comprising exclusively in this case and this plan, the claims of sellers, here objectors, are treated in Class VII. Deferred cash payments over the next four years are proposed to be paid by debtors in a total amount of $165,000.00. In addition, the Class VII creditors are to be paid over the next four years a total of $85,000.00 by the equity security holders of Albrechts. Thus are the unsecured claims of sellers to be satisfied. The plan also includes the express provision with respect to Class VIII that the Albrechts shareholders "shall receive the shares of Canter Inns, Inc. unencumbered by any escrow or other agreement in favor of the Canter Group."

A date for confirmation hearing was set. Prior to that date, sellers timely filed objections to confirmation. A number of grounds were raised, including that the plan was not filed in good faith; that Albrechts does not own the stock of Canter Inns, Inc. "and the plan is defective as not having been filed by the real party-in-interest"; and the plan is not fair and equitable. Ballots were received and tabulated. Predictably, the secured creditors and the equi-

ty security holder class all voted favorably. Also predictably, the Class VII unsecured creditors, the sellers, all voted against the plan, so that this class rejected the plan. As requested by debtors, we then proceeded to an evidentiary hearing on the question of whether the plan was fair and equitable pursuant to 11 U.S.C. § 1129(b). There is no question that fair and equitable equates to the absolute priority rule, and that the plan in this case does not meet the fair and equitable test, for Class VII creditors are not receiving the full amount of their claims, while the next lower class, Class VIII, the equity security holders, retain their interest. It is the position of the debtors, that because of the contribution of $85,000.00 by the equity security holders, the new value exception to the absolute priority rule, recognized in this circuit in *In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir. 1986), has been met.

■ Before proceeding to a consideration of this question, we deal with two parts of the objections filed by the sellers. The first of these has to do with the question of ownership of the stock of Canter Inns, Inc., and the right of the filers of these cases to have filed them and to have proposed a plan. It is too late in the day for the objectors to raise this question. We here make no determination as to ownership of the stock, but do hold that the objection on this ground is overruled as barred by laches. *See Continental Can Co. v. Graham*, 220 F.2d 420 (6th Cir.1955) (creditor's motion for order requiring turnover of debtor's assets barred by laches where motion was made 14 months after the bankruptcy petition was filed).

■ The second ground of objection with which we deal is that of good faith. This court can confirm the proposed plan only if it is found that it has been proposed in good faith. 11 U.S.C. § 1129(a)(3). We hold that it has not. The record before us makes it absolutely clear that, as a matter of fact, these bankruptcies were filed only for the purpose of settling the claims of the sellers of the Ramada Inn on the buyers' terms. The sellers are the only unsecured creditors in the Albrechts case; there are

no other unsecured creditors. Debtors are current with all suppliers of goods and services, with all employees. Jeffrey and Gary Albrecht have found that what was evidently their original intention, to purchase the Ramada Inn by paying $300,-000.00 in invested capital, and the balance of the purchase price out of cash flow from the operation of that motel, was overly optimistic. While this record discloses that they have other enterprises, they are evidently unwilling or unable to contribute other capital to complete the purchase as agreed upon. They believe that Chapter 11 bankruptcy provides a means for unilaterally achieving what they have failed to achieve by negotiation. It perverts the wholesome economic objective of Chapter 11 from an instrument for the rehabilitation of troubled businesses, to one nakedly to allow the remaking of a bilateral contract by one of the parties thereto. *Cf. In re Woolley's Parkway Center, Inc.*, 147 B.R. 996 (Bankr.M.D.Fla.1992) (plan not proposed in good faith where its sole purpose was to relieve debtor's principal of guarantee obligation).

■ We are well aware that in the world of bankruptcy, contracts are not sacrosanct. The Bankruptcy Code at 11 U.S.C. § 365 expressly provides a mechanism for the extrication of a troubled business from an unfortunate executory contract. While we do not hold that the situation before us is to be determined by executory contract law, the situation is analogous. Before an executory contract can be rejected, a court must be persuaded that as a matter of business judgment, a debtor ought to be allowed to reject the contract. One court has soundly held that the business judgment test is not passed where "the sole objective to be achieved by filing for relief ... is to reject a hastily-formed contract in order to avoid the state law remedy of specific performance, the Court should not use its equity powers to assist the debtor in this manipulative endeavor." *In re Southern California Sound Systems, Inc.*, 69 B.R. 893, 898 (Bankr.S.D.Cal.1987). Further, to meet the business judgment test there must be a determination that rejec-

tion will result in benefit for the debtor's general unsecured creditors. *In re Midwest Polychem, Ltd.*, 61 B.R. 559, 562 (Bankr.N.D.Ill.1986).

It is instructive as well to remember that the origins of the absolute priority rule lay in the desire to frustrate collusive arrangements between secured creditors and equity holders at the expense of unsecured creditors. *Northern Pac. R.R. v. Boyd*, 228 U.S. 482, 501–04, 33 S.Ct. 554, 559–60, 57 L.Ed. 931 (1913). The plan here proposed smacks of just such an arrangement.

■■■ We return now to the question of whether debtors' plan satisfies the new value exception to the absolute priority rule. The Supreme Court of the United States has recognized that in certain circumstances equity holders may participate in a plan of reorganization of an insolvent debtor. *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). In *Case*, the United States Supreme Court stated that where "necessities exist and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made." *Id.* "In other words, the Supreme court held that a junior claimant may retain an interest in the debtor even though senior claimants have not been paid in full if the junior claimant makes a cash infusion which is both necessary and substantial to the debtor." *In re 222 Liberty Assoc.*, 108 B.R. 971, 983 (Bankr.E.D.Pa. 1990) (citing *Case*, 308 U.S. at 121, 60 S.Ct. at 10). This statement embodies what is commonly referred to as the "new value" exception to the absolute priority rule. To meet the test for acceptability under the new value exception, there must be a contribution of new cash by equity which is "necessary and substantial" and gives the equity a participation "reasonably equivalent to their contribution." There is no question that what is being proposed in the plan is a contribution of capital in the amount of $85,000.00.

We hold that the requirement of the exception that the contribution be "necessary" is not met for that requirement means that the contribution must be necessary to the operation of the business. That is certainly not the case here. All that the cash contribution is necessary for in the present instance is to pay off the sellers of Canter Inns, Inc. That is quite a different thing. In support of its contention that the necessity test is met, debtors rely upon *In re Eaton Hose and Fitting Co.*, 73 B.R. 139 (Bankr.S.D.Ohio 1987), where a cash contribution by equity to fund a 15% payout to unsecured creditors was approved as meeting the new value test. The *Eaton* case is to be distinguished from the present, for there, as is true in the typical bonafide Chapter 11 case, the debtor is dealing with trade creditors, creditors of the business. Here, debtors are dealing with a very special class made up exclusively of individuals who have sold their interest in the business to debtors. The latter situation has nothing whatever to do with the operation of the business.

Reinforcing our holding that debtors have failed to show that the $85,000.00 contribution meets the "necessary and substantial test" is the position by debtors at the hearing that they would be justified in retaining their equity interest with no payment at all, and that the proposed payment would be a gesture of good faith.

We conclude that debtors' plan does not fulfill the requirements necessary to warrant application of the new value exception.

The objection to confirmation on grounds of an absence of good faith will be sustained. In addition, confirmation of the plan will be denied as not meeting the requirement that it be fair and equitable.

Before ending this decision, we observe that considerable time at the hearing was devoted to the adequacy of the accounting practices of the debtors, it being on the one hand argued that inadequacies in this respect lead to a suspicion of dishonest dealing, and this gives grounds for denial of confirmation. Additionally, these practices were questioned because they provided the factual basis upon which the appraisals were made, and the appraisals are therefore suspect. Though we find it unnecessary to make findings with respect to the

accounting practices of debtors, it does seem that they leave something to be desired, particularly in view of the confession in the rebuttal testimony offered by debtors that a very serious distortion in financial statements was not picked up for a full year.

Since the hearing on confirmation, serious and perplexing questions have surfaced in this case. Particularly, in our review of the evidence following the hearing it for the first time came to our attention what the specific provisions were in the contract of sale of the stock of Canter Inns, Inc. This created a concern in our mind and we invited comment from counsel. A further open question then became apparent, and this had to do with objections to proofs of claim filed by the parties objecting to confirmation. We have dealt with the objections to proofs of claim by separate order issued simultaneously herewith. As to the contract rights of the sellers, so far as they are relevant to the question of confirmation, that is dealt with by our holding that the sellers are barred by laches from raising the question of the propriety of the bankruptcy filing by Albrechts. Further consideration of the contract rights of the parties on this decision regarding confirmation is unnecessary.

## JUDGMENT ON DECISION BY THE COURT ON CONFIRMATION

This proceeding having come on for hearing on confirmation before the court, Honorable Burton Perlman, United States Bankruptcy Judge, presiding, and the issues having been duly heard and a decision having been rendered,

It is Ordered and Adjudged that confirmation of the Chapter 11 plan of debtors is denied.