**In re HRC JOINT VENTURE, an Ohio Joint Venture, Debtor.**

**Bankruptcy No. 94–11085.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Sept. 29, 1995.

Thomas C. Scott, Case Attorney, Columbus, OH, Louis F. Solimine, Local Counsel, Cincinnati, OH, for debtor.

Peter L. Borowitz, Case Attorney, New York City, Jay A. Rosenberg, Lawrence R. Elleman, Local Counsel, Cincinnati, OH, for TIAA.

John A. Schuh, Case Attorney, Cincinnati, OH, for the City.

## DECISION ON CONFIRMATION OF DEBTOR'S AMENDED PLAN AS MODIFIED AND ON OBJECTIONS TO CONFIRMATION

BURTON PERLMAN, Bankruptcy Judge.

The debtor in this Chapter 11 case is the owner of the Hyatt Regency Hotel property in Cincinnati, Ohio (hereafter the "subject property.") The subject property is operated and managed by the Hyatt Corporation ("Hyatt"), pursuant to a Management Agreement entered into between debtor and Hyatt. The first mortgage is held by Teachers' Insurance and Annuity Association of America ("TIAA"). The case came on for confirmation hearing on debtor's Amended Plan as modified (hereafter "the plan"). Objections to confirmation were also the subject of that hearing. This decision deals both with TIAA's objections to confirmation and also debtor's contention that it had met the requirements for confirmation.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this Dis-

trict. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(L). What follows comprises our findings of fact and conclusions of law regarding confirmation of debtor's amended plan as modified, as well as our ruling on the objections to confirmation of TIAA.

The disclosure statement filed by debtor says that certain parties combined to undertake a joint venture for the purpose of owning, maintaining and operating a first class hotel. Over time, the members of the joint venture changed. When the joint venture was originally formed, it entered into a lease agreement with the City of Cincinnati and agreed to develop the subject property by construction of the hotel. The joint venture additionally entered into the Management Agreement with Hyatt to which we have referred. The term of the lease from the City is 65 years with three ten-year options to renew. The loan of TIAA, the first mortgage holder, made in December, 1986, was in the amount of $41 million bearing a 9.75% interest rate, for a ten-year term. Current mortgage payments called for are $352,-258.11 per month or $4,227,097.00 per year. The balloon on the mortgage is due December 31, 1996. Debtor also received a $6 million loan in the form of an Urban Development Assistance Grant ("UDAG") from the City of Cincinnati.

For background purposes we now refer to a portion of the plan, Article X. Further reference to other portions of the plan will be made hereafter. Article X of the plan deals with the distribution of equity interests post-confirmation. Article X provides, first, that the debtor joint venture "shall be converted from an Ohio general partnership to an Ohio limited partnership" to be known as HRC Limited Partnership. The plan defines the term "venturers" as meaning those involved in the original joint venture, namely Saul Schottenstein; Quest; HCV Cincinnati Hotel, Inc.; SIH Partnership; and Lion HRC Limited Partnership.

Article X changes the structure so that the sole general partner in the reorganized debtor will be Quest, while the venturers other than Quest and the City will be limited partners. The plan addresses separately different interests of equity participants in the reorganized debtor. That is, the plan speaks to (1) distribution of profits, and (2) distribution of proceeds upon sale or refinancing of the hotel. The plan as originally presented was considerably modified as hereafter described so it is profitless to describe the original Article X.

After the debtor reached an accommodation with the City of Cincinnati, the modification of the first amended plan to which we have referred was made. A new clause in Article X required that the limited partnership agreement provide that no cash of the reorganized debtor be distributed to any partner prior to the earlier of December 31, 2004, or the sale or refinancing of the hotel. There is to be one class of limited partnership units (instead of the Class A units and Class B units originally provided). These are to be distributed 51% to the venturers collectively, and 49% to the City. The City surrenders its Class C–2 claim, its nonpriority unsecured claim, in exchange for its limited partnership units, and also all claims of the City arising under the lease through December 31, 1994, whether or not they are priority claims, other than claims for rent under § 3(b)(3) of the lease due but unpaid as of the effective date.

Paragraph 4 of the modification makes more specific what these lease claims of the City are. The device for doing this involves a change in Article IX which deals with unexpired leases. In Article IX, debtor assumes the lease agreement between the City and debtor of July 24, 1981, but specificity as to the assumption is stated in the modification. For its 49% of the equity of the reorganized debtor, the City exchanges $1,502,-028.00 in prepetition deferred 3(b)(1) rent and $274,512.00 of postpetition 1994 3(b)(1) rent. Further, 1994 3(b)(3) rent of $112,-000.00 and the 1993 3(b)(3) rent of $114,-000.00 are to be paid at confirmation. Further qualifications on the right of the City to rent are also contained in the modification.

The modification to the first amended plan makes no change in the provisions of the plan with respect to the treatment of TIAA. Class B–1 is the allowed secured claim of TIAA, while Class C–1 is the allowed nonpri-

ority unsecured claim of TIAA. In Article I, Definitions, appears a description of "TIAA Amortizing Note" (hereafter the "Am Note"). This is stated to mean a promissory note to be issued in an original principal amount of $28,152,620.00 by the reorganized debtor. The Am Note is to bear simple interest at the rate of 8.86% for the first 24 months after the effective date, and thereafter through its maturity at the rate of 7.86%. Interest only is to be payable monthly during the first 24–month period. Thereafter, the Am Note is to provide for a monthly payment in an amount sufficient to amortize over a 240–month period the principal balance with interest at the rate of 7.86%. The Am Note is to be secured by a first mortgage and security interest in the interest of the reorganized debtor in the hotel.

Also defined is "TIAA Accruing Note" (hereafter the "Acc Note"). This refers to a promissory note in the original principal amount of $2,300,000.00 of which the reorganized debtor is the maker. The Acc Note is to bear and accrue simple interest at the rate of 7.86%, and shall be secured by a second mortgage and security interest in the interest of the reorganized debtor in the hotel. The Acc Note is a nonrecourse obligation of the reorganized debtor.

The first amended plan, then, treats the claims of TIAA as follows. As to Class B–1, the allowed secured claim of TIAA, the following four elements are provided: (1) $500,000.00 to be paid upon the effective date from the settlement of the contested matter regarding the capital Deposit Accounts; (2) $2,064,539.00 to be paid on the effective date from the undisputed cash collateral defined in Article I as having the meaning in an earlier entered cash collateral order; (3) the balance, but not to exceed $22,340,422.00, to be satisfied by the Am Note; and (4) the allowed secured claim, to the extent not satisfied by the provisions of paragraphs 1, 2, and 3, to be paid by and in accordance with the Acc Note. The original undertakings between debtor and TIAA of 1986 continue in effect, except as modified by the first amended plan. TIAA retains its lien to the extent of the unpaid balances of the Acc Note and the Am Note, but otherwise its lien is void.

As to Class C–1, TIAA's unsecured allowed claim, TIAA is to receive $500,000.00 on the effective date and the Acc Note to the extent not applied in satisfaction of the TIAA secured claim.

Shortly before the confirmation hearing, debtor filed a second modification to the plan. This second modification does affect TIAA and involved changes in Article I and Article IV of the plan. Article I adds to definitions, the term "Additional Proceeds" which term refers to the sum of $1,300,000.00 which may be paid to TIAA on the effective date on account of its secured and unsecured claims. Article IV then is changed, and now if the four elements recited above do not satisfy Class B–1, then the Additional Proceeds will be applied to the TIAA secured claim. Additionally, the second modification affects also treatment of the TIAA unsecured claim, Class C–1. That modification provides that TIAA shall receive the $500,000.00, and in addition shall receive the Acc Note and the Additional Proceeds, so that now the Additional Proceeds serve as backup to Class C–1, and this was not true in the amended plan.

The plan makes no provision for general unsecured creditors because debtor has been paying its trade debt on a current basis pursuant to a cash collateral order.

Before the court is the question of confirmation of the first amended plan as modified by the two modifications which have been made by debtor. Debtor and the City are proponents of the plan. Objections to the first amended plan as modified are also before the court for adjudication. Questions of confirmation and objections thereto depend upon whether the modified plan meets all of the requirements of 11 U.S.C. § 1129. The following clauses of § 1129 are not the subject of objection and we find that each of them is satisfied under the plan: § 1129(a)(2), (4), (5), (9), and (12). We note that §§ 1129(a)(6) and (13) are not applicable to this case.

Rather than proceeding sequentially through the remaining clauses of § 1129, we find it preferable to deal with the objections to confirmation in the order presented by TIAA. This means that we concern our-

selves with the provisions of § 1129(b) before we proceed to consider the remaining provisions of § 1129(a).

### Section 1129(b)

TIAA has made objections which stem from § 1129(b)(1) and § 1129(b)(2). The pertinent portions of the statute are:

\*　　\*　　\*　　\*　　\*　　\*

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (ii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

\*　　\*　　\*　　\*　　\*　　\*

■ 1. Section 1129(b)(2)(A)(i)(I). The first objection of TIAA arises under this provision. That is, TIAA argues that instead of retaining its lien as required by the statute, its lien interest is impermissibly reduced by the first amended plan. More specifically stated, TIAA says that it "is secured by a mortgage on and security interests in the Property and all of the rents, proceeds, profits, accounts receivable and operating revenues of the Hotel." (TIAA memorandum p. 19.) At the same place, TIAA then says that "any circumstance that reduces or diverts any of these rents, proceeds, profits, accounts receivable and operating revenues away from the Hotel will necessarily decrease the value of Teachers' collateral and reduce the coverage of its lien." Because of the way the plan works, TIAA says that the coverage of its liens is reduced by some $1.3 million. TIAA explains the basis for its position. Rent obligations to the City are payable, according to the lease, only to the extent that they do not exceed "actual cash flow." TIAA then says that so long as its $45,783,844.00 indebtedness remains outstanding there will never be "actual cash flow" under the lease. Implementation of the terms of the plan, however, will produce an increase in "actual cash flow", and because of this, rent payments to the City will have to begin being made in 1997, and the City will receive, at present value, some $1,291,215.00 more than it would receive without the modifications to the lease con-

templated in the plan. TIAA says that this benefit to the City results "directly from the operation of the Plan, and in particular, from the Plan's discharge of approximately $20 million of the indebtedness owed to Teachers." At the heart of this objection by TIAA is a contention that it is entitled to have its collateral valued as of the date of confirmation and this includes the value of its right to "rents, property, revenues, profits, and accounts receivable." TIAA then goes on to argue that the plan could have been devised differently. It could have been fashioned so as not to favor the City with enhanced rent payments.

Debtor, in its counterargument, characterizes the objections raised as having to do with "diversion" and "subordination". Thus, debtor in its memorandum refers us to its discussion of § 510(a) of the Bankruptcy Code which has to do with subordination agreements. Such counterargument on the part of debtor is not helpful. The objection here presented by TIAA is not one based upon the relative rights between TIAA and the City. It is rather a question of TIAA's rights as a secured creditor as affected by debtor's plan or, rather, the consequences of implementation of debtor's plan.

Notwithstanding that we find debtor's responsive argument to the present objection of TIAA flawed, we conclude that the objection is without merit. TIAA itself points out its basic flaw: the asserted reduction in the value of its collateral results from the reduction in value of the property by $20 million. It is not the plan which reduces the value of the right of TIAA in rents, profits, etc.; it is the decline in value of its principal collateral, the property. If the argument of TIAA were accepted, no cramdown plan involving the treatment of an allowed secured claim in an amount less than the total claim of the creditor could be confirmed. In any case, it is a contract right which is here in issue, and TIAA continues to be secured by that right. The present value of that right, however, is not fixed, but is subject to adjustment for future events. The contract right in collateral which TIAA has here placed in issue is not directly dealt with in the plan, though its value may be affected by the plan. If the plan in its provisions is unobjectionable, a secondary effect of the operation of the plan gives no basis for a valid objection.

■ 2. Section 1129(b)(2)(A)(i)(II). The Code there provides:

(b)(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

The heart of this objection by TIAA is that a major element of its collateral is the hotel, and it is entitled to receive under the plan consideration equal to the value of the hotel, and, in addition, on account of the deferred payments, augmentation by a discount rate which will give it the present value of its collateral. At the hearing, the parties presented a joint stipulation as to that value (JX 1):

1. As of the date of this stipulation, the value of TIAA's security interest in the Debtor's interest in the Hyatt Regency Cincinnati leasehold (excluding TIAA's interest in cash collateral arising on or prior to this date, and including the lease modifications proposed under the Plan) is $23,445,915, provided that TIAA asserts and the Debtor denies that an additional value of at least $1.3 million relating to the present value of certain rental payments should be added to such value.

This stipulation removes from the debate the differences in valuation upon which the parties rested their arguments in their pretrial memoranda. Nevertheless, TIAA continues to assert its objection based upon the mentioned statutory provision. TIAA says that the "Plan proposes to satisfy Teachers' secured claim through delivery of the Amortizing Note and, to the extent necessary, the Accruing Note." TIAA asserts that the

present value of these notes is $21,755,054.64. TIAA reaches this valuation by applying a discount rate of 13.5%. Debtor takes serious issue with this discount rate and asserts that the proper rate is 11.6% which, if applied, would give TIAA $24,798,537.00 as the present value of the Amortizing and Accruing Notes and this far exceeds the stipulated value of the hotel. Much of the evidence adduced at the hearing had to do with a determination of the correct discount rate to be applied.

The starting point in this discussion is that we are required under the law to determine the appropriate discount rate for this context. *In re Willowood East Apartments of Indianapolis,* 113 B.R. 392, 397 (Bankr. S.D.Ohio 1990). The familiar formulation for such a discount rate is that it should be the current market rate for similar transactions. *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982); or *see 5 Collier* § 1129.03 [4][f][i]. The present case presents a difficulty in applying this standard, because the standard assumes the existence of a market rate. For the present case, both parties agree that there is no market rate, because what is involved is a loan at 100% loan to value, and no one will make a loan under those circumstances. (This is hardly a unique situation in the annals of Chapter 11. *See e.g. In re Birdneck Apartment Associates, II, L.P.,* 156 B.R. 499 (Bankr.E.D.Va. 1993); *In re Rivers End Apartments, Ltd.,* 167 B.R. 470, 484 (Bankr.S.D.Ohio 1994)). So debtor here has the burden of persuading the court that its plan provides a discount rate which fairly compensates TIAA for the fact that it will be receiving deferred payments, the standard calling for market rate where there is no actual market rate. Both parties offered testimony on the question.

Brian T. Nordahl presented expert testimony on the subject of the proper discount rate on behalf of the debtor. Nordahl is a duly qualified accountant with the firm of Deloitte and Touche. He has experience in the field of hospitality enterprises and the factors which enter into the market in connection with those enterprises. Nordahl's task was to suggest a methodology appropriate to the circumstances. His methodology started with a security having what is regarded as having a risk-free rate of return, that is, the market rate on a 10–year treasury note. The current yield on such a security is 5.76%. Nordahl then increased the risk-free rate to the level of a corporate Baa 10–year bond which was 6.7%, an increase of 94 basis points over the treasury rate. (Basis point means 100th of 1%.) Nordahl then developed what he called a beta factor in order to adjust the rate for the "systematic" risk involved. The source of Nordahl's beta was from a number of publicly traded hotel stocks which, in his opinion, was the best available factor. He arrived at a 1.25 beta. He then increased the initial risk-free rate by 25% "to account for the market risk associated with this type of investment." This led to an increase of 168 basis points.

The next and final step was to develop an "alpha" factor representing "non-systematic" risk, that is, the risk in the specific present situation. Nordahl said there are two components here, management and liquidity, liquidity referring to a period it would take to sell the hotel. Nordahl added 200 basis points on account of management and 100 basis points on account of liquidity. Applying this alpha factor, Nordahl wound up with a discount rate of 11.4%. Cases which use the same methodology as did Nordahl, that is, starting with a risk-free investment and building on that, are *In re Ridgewood Apartments,* 183 B.R. 784 (S.D.Ohio E.D.); *In re River Village Associates,* 161 B.R. 127, 139 (Bankr.E.D.Pa.1993); *In re Rivers End Apartments, Ltd.,* 167 B.R. 470, 484 (Bankr. S.D.Ohio 1994); *In re Eastland Partners, Ltd.,* 149 B.R. 105 (Bankr.E.D.Mich.1992).

TIAA challenged Nordahl's opinion not merely on cross-examination, but as well through the testimony of its own expert, David S. Williams. He is also a well-qualified accountant, and is a partner of Price Waterhouse, LLP. Major points contended for by TIAA with respect to the Nordahl analysis is the assertion that it does not take into account that what is being considered is a 100% loan to value situation, nor that the position of TIAA is as a non-recourse lender. These factors, asserts TIAA, ought to increase the discount rate arrived at by Nor-

dahl. We find, however, that these contentions are invalid. As Nordahl testified, the 100% loan to value aspect is subsumed in the entire exercise, for if there were a lesser loan to value ratio one could simply look at actual market rates. Nor is merit to be found in the assertion that Nordahl's methodology fails to take into account that the loan is non-recourse, for such loans commonly are without recourse.

The foregoing two points emerged not just on cross-examination of Nordahl, but also through the direct testimony of Williams. In addition to these two points, Williams questioned Nordahl's methodology in several other respects. He questioned Nordahl's use of hotel enterprise stocks to arrive at his beta, contending that a bond beta would be a sounder basis. He questioned as well Nordahl's alpha, principally on grounds of undue subjectivity which entered into that calculation. The Nordahl methodology withstands these attacks. It scarcely needs discussion that for the same enterprise, a bond beta will be indicative of less risk than will a stock beta, so that if Nordahl had employed a bond beta, it is fair to assume that he would have arrived at a lower discount rate than he did. As to subjectivity, clearly there is a great deal of this on the part of the expert called upon in deriving what is, after all, a hypothetical discount rate. Indeed, it seems to this court that the methodology suggested by Williams, and as presented by Williams, is more subjective and less rational than the Nordahl approach.

Williams, on behalf of TIAA, was the proponent of the view that the proper discount rate which should be employed is 13.5%. It happens that this is the same discount rate arrived at and employed by both real estate appraisers. There is nothing in this record to support the proposition that the rationale for determination of a discount rate for real estate valuation purposes is the same as should be applied in determining a discount rate to determine present value of money. In any case, a review of the appraisal reports in evidence discloses that both appraisers arrived at their conclusions using highly subjective choices. The appraiser for debtor was the Bernes Company. After referring to various sources examined by the appraiser, the Bernes report says:

However, in our discussions with persons knowledgeable of the luxury hotel market and the subject, we gained information on discount rates used by investors in the hotel market. Due to the nature of the subject property, its location and position in the market, in the estimated holding period, we conclude that a discount rate of 13.5% would be applicable to the annual cash flows.

TIAA's appraiser was the Pinnacle Advisory Group. In Pinnacle, the approach to determine a discount rate was to ascertain that a commercial mortgage at 65% loan to value could be obtained. Pinnacle then estimated a rate for such a loan at 9.25%. (The basis for this is unclear. As far as we can see, such a number can only be derived from what is identified in the Pinnacle report as "overall capitalization rates", and we do not see how this is related to the present inquiry.) Pinnacle then goes on to estimate a discount rate for the remaining 35% of the loan, arriving at a conclusion of 22%. This is highly questionable. First, it is questionable because it seems to be a rate for return on equity, rather than for a return on a collateralized loan. Second, there is no apparent basis in the appraisal for this figure other than that the appraiser's opinion was that it was appropriate. What Williams did is not distinguishable from what Pinnacle did, and it is therefore not surprising that he arrived at the same discount rate. He separated the hypothetical loan into two components just as did Pinnacle, and he lifted from Pinnacle the respective rates to be applied to each component, giving no other explanation than that they were employed by Pinnacle. Not being satisfied that the Pinnacle appraisal adequately supports the rates employed to reach its conclusion, we can hardly give credence to a computation based on the same rates and employed by Williams without independent verification.

In considering the present question the court noted with interest the following cases and the discount rates which they applied. All these cases involved 100% loan to value situations: *In re Oaks Partners, Ltd.,* 135

B.R. 440 (Bankr.N.D.Ga.1991) (discount rate 10.25%, derivation: treasury bill rate plus 3%); *In re Computer Optics, Inc.,* 126 B.R. 664 (Bankr.D.N.H.1991) (discount rate 12%, derivation: treasury bond rate plus 4%); *In re Bloomingdale Partners,* 155 B.R. 961 (Bankr.N.D.Ill.1993) (discount rate 9.5%, derivation: treasury bond rate plus 325–350 basis points); *In re Overland Park Merchandise, Mart Partnership, L.P.,* 167 B.R. 647 (Bankr.D.Kan.1994) (discount rate 9.5%, derivation: treasury bill rate plus 250 basis points); *In re River Village Assoc.,* 161 B.R. 127 (Bankr.E.D.Pa.1993) (discount rate 9%, derivation: treasury bill rate plus 3%); *In re IPC Atlanta Ltd. Partnership,* 142 B.R. 547 (Bankr.N.D.Ga.1992) (discount rate 11.5%, derivation: treasury bond rate plus 3%); *In re Aztec Co.,* 99 B.R. 388 (Bankr.M.D.Tenn. 1989) (discount rate 11.17%, derivation: treasury bill plus 2%); *In re Rivers End Apts., Ltd.,* 167 B.R. 470 (Bankr.S.D.Ohio 1994) (8.4% discount rate approved, derivation: treasury note plus 250 basis points); *In re SM 104 Ltd.,* 160 B.R. 202 (Bankr.S.D.Fla. 1993) (8% discount rate disapproved, court holding that needed was treasury bond rate of 5.65% plus 398 basis points, or 9.65%).

We conclude that debtor has sustained its burden to prove that 11.4% is a reasonable discount rate to be applied in arriving at present value, and we conclude further that the rate advocated by TIAA, 13.5%, is excessive.

■ 3. Section 1129(b)(2)(B). Because TIAA will be receiving on account of its unsecured claim an amount less than the allowed amount of the claim, in order to comply with the requirements of § 1129(b)(2)(B), debtor must face the requirement at § 1129(b)(2)(B)(ii), the absolute priority rule, that any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest in any property. Actual compliance with this requirement can be excused (1) where the new value exception is accepted by the ruling court, and (2) the requirements of the new value exception are met. This court does accept the new value exception to the absolute priority rule. *See In re U.S. Truck, Inc.,* 800 F.2d 581 (6th Cir.1986); *In re Albrechts Ohio Inns, Inc.,* 152 B.R. 496 (Bankr.S.D.Ohio 1993). In order to satisfy the new value exception, debtor must prove that the contribution from equity is (1) in money or money's worth, (2) necessary to a successful reorganization, and (3) reasonably equivalent to the value of the interest that will be retained. *In re Snyder,* 967 F.2d 1126, 1131 (7th Cir.1992); *In re Creekside Landing, Ltd.,* 140 B.R. 713 (Bankr.M.D.Tenn.1992); *In re Montgomery Court Apartments,* 141 B.R. 324, 344 (Bankr. S.D.Ohio 1992); *In re SM 104 Ltd.,* 160 B.R. 202, 226 (Bankr.S.D.Fla.1993). The new value, as stated earlier, which the venturers are committed by the plan to contribute is $1.3 million.

TIAA argues that this is plainly not a substantial contribution, that when one compares the $1.3 million to the discharge of some $25 million in unsecured claims of TIAA and the City, this is no more than 4.4% of the unsecured claims, and this is inadequate. Additionally, TIAA says that, considering the substantial wealth of the venturers, the proposed $1.3 million contribution does not represent the equity holders' best efforts as required in *In re Union Meeting Partners,* 165 B.R. 553, 570 (Bankr.E.D.Pa.1994) and *In re Wynnefield Manor Associates, L.P.,* 163 B.R. 53, 57 (E.D.Pa.1993).

■ The court finds the first requirement for application of the new value exception is clearly met by the undertaking to contribute $1.3 million in new money to the enterprise. *In re Albrechts Ohio Inns, Inc.,* 152 B.R. 496, 502 (Bankr.S.D.Ohio 1993). The second requirement, that the contribution be necessary to a successful reorganization, means that the contribution must be necessary to the operation of the business. *See In re Albrechts, supra.* The evidence is that the money will be used to implement the payments provided for by the plan, provide working capital for the operation, and provide funds so that the guest rooms of the hotel may be renovated. The evidence was incontrovertible that an early and major expenditure for renovation of guest rooms was indispensable for continued viability of the hotel. We hold the second requirement to be satisfied.

The final requirement here is that the contribution be reasonably equivalent to the value of the interest retained under the plan. It is suggested that we adopt the reasoning of the court in *In re SM 104, Ltd.,* 160 B.R. 202 (Bankr.S.D.Fla.1993) in valuating this requirement. The court in that case suggests that balance sheet values be examined to answer the present question. Since the value of the assets was just offset by the liens thereon, there was no value for equity, and therefore the view of that court was that any contribution would be adequate. We do not see this exercise as useful, but rather hold, as is suggested in *U.S. Truck,* that a consideration of the riskiness of the investment is in order. Here is an enterprise which has required the relief of the Bankruptcy Code. It is in a market where the evidence showed that significant new competition will be emerging. The debtor's prospects are risky indeed. Because of this, we hold that the third element of the new value test is satisfied by the infusion of $1.3 million.

TIAA has called to our attention cases in which courts comment about the new value contribution in relation to the amount of discharged unsecured debt. We suppose that it is the purpose of those courts to use this as the measure of the element of the allowability of the new value contribution, that it be reasonably equivalent to the value of the equity interests. This court is unable to place any reliance on this as a measure of reasonable equivalence in the sense here under discussion. We consider that factor to be entirely gratuitous and irrelevant to the present discussion.

We find equally to be without merit TIAA's argument that application of the new value exception in this case would result in "lien-stripping" and therefore be unfair and inequitable. To make this argument, TIAA acquaints us with the background of § 1111(b) of the Bankruptcy Code which was added to the bankruptcy law after *In re Pine Gate Associates,* 2 BCD 1478 (Bankr.N.D.Ga. 1976), a case under the Bankruptcy Act in which the lender was cashed out at market value. That, of course, is precisely the scenario for which the § 1111(b) election was placed in the statute. TIAA did not take advantage of the election there made available to it. If it had, it would have been necessary for debtor to deal with its entire claim as secured. TIAA's argument here is nothing more than a contention that it should have the benefits of § 1111(b) without having made the election. Plainly, it is not entitled to this, and we find its argument to be without merit.

■ 4. Section 1129(b)(1). TIAA here argues that the plan discriminates unfairly against its unsecured claim. TIAA argues at some length on this point, but the essence of its contention is that the City holds an unsecured claim comparable to that of TIAA, and the City is treated better than is TIAA in the plan. Such discrimination, says TIAA, is unfair. TIAA estimates its unsecured deficiency claim at $20,519,305.00. It posits that it will receive a total distribution on account of that claim in the amount of $500,000.00, or approximately 2.43% of its claim. The City, on the other hand, it says, holds an unsecured deficiency claim by reason of the UDAG loan in the amount of $8,749,151.00. TIAA then says that under the plan the City will receive equity of estimated value $1.3 million; a $1.3 million net increase in the present value of the rent stream payable under the lease as a result of the plan; an equity interest, and as an equity holder the right to share in any avoidance claims. There is no question that TIAA and the City are treated differently under the plan. The question is whether the treatment can be justified.

TIAA suggests the parameters which would justify the perceived discrimination: (1) that there is a reasonable basis for the discrimination; (2) that the debtor cannot carry out a plan without the discrimination; (3) the plan and the discrimination were proposed in good faith; and (4) the treatment of the class discriminated against is proportional to the rationale for the discrimination, citing *In re Kemp,* 134 B.R. 413, 417 (Bankr. E.D.Cal.1991); *In re Buttonwood Partners,* 111 B.R. 57, 63 (Bankr.S.D.N.Y.1990). Debtor does not disagree that these are the criteria to be applied. Indeed, it also sets them forth, but cites *In re Creekside Landing,*

*Ltd.,* 140 B.R. 713, 717 (Bankr.M.D.Tenn. 1992).

After due consideration, we have concluded that there is no impermissible discrimination. This conclusion is based on the same considerations which have led us to the conclusion reached below, pp. 212–16, that it is justifiable separately to classify the unsecured claims of TIAA and the City. Principally, the conclusion is based on the fact that the disparate treatment of TIAA and of the City is because of the different nature of their interests.

### Section 1129(a)

5. Section 1129(a)(1). This clause requires a finding that the plan complies with the applicable provisions of the Bankruptcy Code. Subheads of this argument are presented by TIAA, first, that the plan violates § 524(e) of the Code and, second, that the plan violates § 510(a) of the Code.

 (a) Section 524(e). Section 524 is entitled Effect of Discharge, and at (e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." In other words, the Code prohibits any plan provision affecting the liability of a third party co-liable with a debtor on a debt. TIAA says that contrary to this requirement, the plan would limit the obligations of the City to TIAA. There is a subordination agreement contained in the lease between the debtor and the City, whereby the City agreed to subordinate its fee interest to TIAA's lien. This, says TIAA, appears in § 6(i) of the lease and this makes the City a non-recourse guarantor to the extent of its fee interest in the hotel, of debtor's mortgage obligations to TIAA. The disclosure statement of debtor at p. 12 states that in the event of default TIAA's remedies will be limited to the amount of its allowed secured claim. The plan at p. 10, in stating the treatment of the secured claim of TIAA, provides that TIAA will not proceed against the City for any deficiency. This, says TIAA, is inconsistent with its right vis a vis the City under the subordination agreement in the event of a default by the reorganized debtor.

Debtor responds that the plan takes no affirmative position with respect to the relationship between TIAA and the City; that its plan provisions are entirely permissive; and any consequences that flow are not of its doing. Furthermore, it argues that TIAA could have bargained initially for an independent mortgage agreement with the City instead of making its interest a conditional one tied to the actions of the debtor.

We conclude that the plan does not offend § 524(e), and the objection of TIAA on this score is ill-founded. The argument of TIAA to the contrary can only be comprehended if one understands TIAA to be saying that the subordination agreement by the City constitutes the City a guarantor of the obligations of the debtor to TIAA in the amount of any deficiency in the event of a post-petition foreclosure. That that is the position of TIAA is clear from the authorities upon which it relies. *Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439 (6th Cir.1993); *NCNB Texas Nat. Bank v. Johnson,* 11 F.3d 1260 (5th Cir.1994). The *Moore* case deals with a conventional guaranty agreement in which an individual personally guaranteed the obligations of a corporation. Contrary to the position of TIAA in the case before us, the court in *Moore* held that the liability of the guarantor was commensurate with that of the principal, and before the liability of the guarantor could be determined, the liability of the principal must first be determined.

*Moore* is not helpful to TIAA, first, because there is a factual difference, there is no express guaranty agreement by the City running to TIAA. Second, even if one were to regard the City as a guarantor, its obligations depend upon those of the debtor. Where, as here, the debtor modifies the rights of TIAA in a way consistent with the Bankruptcy Code, TIAA has no basis for complaint about its rights vis a vis the City. In *NCNB*, again there was a conventional guaranty in question, and the court correctly observed that the discharge of a debtor cannot affect a guarantor's liability. The discussion in that case at p. 1266 makes it clear that in that case guarantors had expressly guaranteed any deficiency "on the unpaid portion of the guaranteed debt that remained

after the plan was completed." Again, the *NCNB* case is distinguishable from that before us because here there is no express guaranty by the City of the deficiency on the prefiling claim of TIAA after reorganization. The rights of TIAA against the City conferred on TIAA by its subordination agreement do not constitute the City a guarantor of TIAA's claim against the debtor. The contract rights of TIAA against the City which arose by reason of the subordination agreement are not affected by the plan. We therefore hold that debtor's plan complies with § 524(e).

■ (b) Section 510(a). This Code section is entitled Subordination, and provides that a subordination agreement is enforceable "to the same extent that such agreement is enforceable under applicable non-bankruptcy law." Here, TIAA once again, as it did in objecting that § 1129(b)(2)(A)(i)(I) was not met, brings into play the fact that confirmation of the plan will increase the City's right to payment of rents under the lease. TIAA says that the City's right to rent payments was subordinated to its right to receive payment of its debt service. TIAA says that by increasing rent to the City "without providing Teachers with prior payment in full of the Teachers' Loan," its rights as the beneficiary of a subordination agreement are adversely affected and this is violative of § 510(a).

While TIAA may be correct that prefiling it had contract rights which, in a descriptive sense, amounted to a subordination of the rights of the City to its rights, this is not a subordination agreement within the meaning of § 510(a). The consequences about which TIAA is here complaining flow from the lease. The position of TIAA on this theory is based on the same facts as the theory discussed above regarding the objection of TIAA based on § 1129(b)(2)(A)(i)(I). It is lacking in merit here for the same reasons discussed above at pp. 206–07.

■ 6. Section 1129(a)(3). Here the Code requires that the plan have "been proposed in good faith and not by any means forbidden by law." TIAA says that debtor's plan is not proposed in good faith because (1) if the plan is not confirmed, TIAA will foreclose on the hotel and continue to operate it, so that in either case an operating hotel will remain; (2) debtor and its equity holders get a fresh start whether or not the plan is confirmed; despite holding "a substantial majority of the unsecured claims," TIAA is not allowed to control the reorganization; the bankruptcy case was filed during a pending foreclosure proceeding in the state court; and since the case involves the interests of only three parties, adjusting their rights in state court would be more appropriate.

Debtor responds by citing authority, as did TIAA, for the proposition that a determination of good faith is to be made based on an examination of the totality of the circumstances. Two points should be sufficient to dispose of TIAA's objection in this regard. First, it is no indication of a lack of good faith to say that the same results which will follow from the confirmed plan could be achieved by another course. Second, this court is satisfied that debtor has put forth its plan with a legitimate rehabilitative purpose. Confirmation of the plan will have to stand or fall on other grounds.

■ 7. Section 1129(a)(7). It is worthwhile to set out this paragraph in its entirety:

(a) The court shall confirm a plan only if all of the following requirements are met:

\* \* \* \* \* \*

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

\* \* \* \* \* \*

This is commonly known as the best interest of creditors test. TIAA says that, separately, this requirement is not satisfied as to its secured claim and to its unsecured claim.

(a) TIAA's secured claim. In this objection, TIAA says that it will receive more on account of its secured claim upon liquidation under Chapter 7 than it will under the plan. Thus, it says that under the plan it will receive (1) $2,564,539.00 in cash collateral, (2) the Am Note, and (3) the Acc Note. It says that the aggregate present value of the Am Note and the Acc Note is $21,755,054.00. It says, therefore, that the total value of its distribution under the plan will be $24,319,-593.00. Upon liquidation, by contrast, TIAA says that it will receive not only the $2,564,-539.00 in prepetition cash collateral, but also the full value of the debtor's interest in the hotel. While in its argument TIAA gives a range of values for the hotel, the parties have stipulated that the value is $23,445,915.00. Thus, it is TIAA's argument that on liquidation it will receive the total of $23,445,-915.00 plus $2,564,539.00, for a total of $26,-010,454.00. Since this exceeds what TIAA says it will be receiving under the plan, the plan fails the best interest of creditors test of § 1129(a)(7).

There is, however, a fatal flaw in the analysis of TIAA in arriving at these figures. In order to arrive at a present value of the Am Note and the Acc Note of $21,755,054.00, TIAA applied a discount rate of 13.5%. This we have found to be excessive. In our discussion at pp. 207–10, we held the discount rate utilized by debtor, 11.4%, to be the acceptable rate. The objection of TIAA based on its contention that it would receive a greater monetary value on a Chapter 7 liquidation than it would under the plan is without merit.

There is, however, more to the objection on this score by TIAA than just monetary values, for it says that if the plan is not confirmed, it could foreclose, in which case it would receive control of the hotel, and also the benefit of appreciation. In addition, it would have an opportunity to get rid of the City's interest in the hotel, for it believes it has this right under the lease. These contentions add no merit to this basis of objection on the part of TIAA. First, if the prevention of foreclosure by a mortgagee were a basis for objecting to confirmation, no real estate reorganization under the bank-

ruptcy law could ever occur, at least, in the absence of the consent of the mortgagee. Nowhere is it suggested that a mortgagee has, or ought to have, the right to totally frustrate Chapter 11 of the Bankruptcy Code. Furthermore, with respect to its contention that it ought to be able to have access to the benefit of any appreciation in the value of the hotel, the Bankruptcy Code makes this possible. In order to do so, TIAA would have had to make the § 1111(b) election, but it did not do so. It cannot now complain that it has been deprived of the benefit of that election.

■ (b) TIAA's unsecured claim. TIAA objects as well that it would do better on liquidation on account of its unsecured claim than it does under the plan. It is clear that in making this assertion TIAA must confront the well-established proposition that a nonrecourse creditor has no right to a recovery from a debtor on a deficiency claim. The Bankruptcy Code at § 502(b)(1) states that the court shall not allow a claim which is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; ..." The Legislative Statements following § 502 state that the section was:

> intended to result in the disallowance of any claim for deficiency by an undersecured creditor on a nonrecourse loan or under a State anti-deficiency law, special provision for which is made in section 1111, since neither the debtor personally, nor the property of the debtor is liable for such a deficiency.

Taken together, these declarations indicate that outside of Chapter 11, a nonrecourse deficiency claim is not recoverable from the estate. As a result, such a claim would be unrecoverable in a Chapter 7 liquidation. *See also In re SM 104 Ltd.,* 160 B.R. 202, 219 (Bankr.S.D.Fla.1993) (reasoning that general unsecured claims and nonrecourse deficiency claims should be separately classified because "in a Chapter 7 case, the unsecured deficiency claim created by § 1111(b) would not exist and would not be paid at all."); *In re Dean,* 166 B.R. 949, 953 (Bankr. D.N.Mex.1994) (holding that nonrecourse de-

ficiency claims should not be separately classified from general unsecured claims but recognizing that in a Chapter 7 liquidation the debtor could pay nothing on the deficiency claims and still meet the requirements of the best interests test); *In the Matter of Woodbrook Associates,* 19 F.3d 312, 318–319 (7th Cir.1994) (holding that separate classification of general unsecured claims and non-recourse deficiency claims is necessary, in part, because unsecured claims are entitled to share in a Chapter 7 liquidation but deficiency claims are not entitled to any payment in a Chapter 7 liquidation).

TIAA here relies upon *Matter of Vintero,* 735 F.2d 740, 742 (2nd Cir.1984), cert. denied 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984) to urge a different result. TIAA looks to this case to substantiate its position that despite the nonrecourse nature of debtor's obligation to it, on liquidation it would still have a right to participate in any distribution to unsecured creditors in accordance with the amount of its deficiency claim. Under the terms of the plan, says TIAA, it will receive in toto only $500,000.00 in respect of its unsecured claim. On liquidation, however, there would be a total of $1,760,044.00, minimum, for distribution to unsecured creditors of which it would be entitled to receive some 60% or approximately $1,100,000.00. So, it concludes, the best interest test when applied to its unsecured claim, is not met.

This court holds that *Vintero* is inapplicable here. It was decided under the Bankruptcy Act, and is not applicable under the Code in view of the legislative history of § 502(b)(1) of the Code and the cases to which we have referred above. In addition, as asserted by debtor, TIAA will receive considerably more than $500,000.00 under the plan. It will receive a total of values of $2,598,537.00, comprised of the Acc Note having a present value of $1,352,622.00, the cash payment of $500,000.00, and the present value of the TIAA Am Note in excess of $22,700,000.00, amounting to $745,915.00.

■ 8. Section 1129(a)(10). The Bankruptcy Code here requires that if there is an impaired class, then at least one class of impaired claims must accept the plan. In its plan, debtor has classified the unsecured claim of TIAA and provided for its treatment. This is Class C–1. TIAA has voted this class against the plan. Class C–2 is the unsecured claim of the City, and its treatment is prescribed in the plan. The City's unsecured claim is impaired and it has voted in favor of the plan, and thus, says debtor, the requirement of § 1129(a)(10) is met. TIAA objects, saying that there is no valid basis for distinguishing between its unsecured claim and that of the City; they are both just unsecured claims. If they were classified together the claim of TIAA would greatly exceed that of the City, and that class would be voted against the plan. The question presented, then, is whether the separate classification of the unsecured claim of the City can be justified by the debtor.

TIAA's unsecured claim is simply the classical deficiency claim which is asserted by a now unsecured lender. From the proof of claim filed by the City, we see that its claim is made up first of the balance on the UDAG loan, said to be secured by a second mortgage. There is, of course, no collateral for this loan and so this portion of the claim is in effect a deficiency claim by a secured party. In addition to the UDAG loan balance, the proof of claim includes a claim for unpaid rent, based on two separate components and thirdly, a balance on a Special Revenue Note. Thus, important elements of the proof of claim of the City derive, not from its position as a secured lender, but from its position as a landlord, and its position as a governmental body. In our judgment, the differences between the interests of the two claimants, TIAA and the City, are such as to justify separate classification in accordance with the tests prescribed by *In re U.S. Truck Co., Inc.,* 800 F.2d 581 (6th Cir.1986). In *U.S. Truck,* the court sustained separate classification of the unsecured claim of a trade union which arose from rejection of its collective bargaining agreement, from the claims of other unsecured creditors. Finding that the interests of the union differed substantially from those of the other creditors, the court held that separate classification was justifiable because of "a different stake in the future viability of the reorganized company and [because the union] has alternative

means at its disposal for protecting its claim." In allowing separate classification, the court noted that the union had a noncreditor interest, which was not true of the other unsecured creditors. Further, the court observed that allowing separate classification does not necessarily mean that the plan will be confirmed, for other provisions of § 1129 intended to protect the interests of creditors must still be met, and, we take it, this is what the court meant when it referred to "alternative means at its disposal for protecting its claim."

Certainly in the present case, the City has substantial noncreditor interests in a reorganized debtor, interests which TIAA does not share. Debtor's hotel is an important feature in the downtown area of the City. Another important feature of downtown Cincinnati is its convention center, and the City has a vital interest in the availability of desirable hotel accommodations to service that facility. The argument of TIAA that if it were to take over the hotel, it, like the debtor, would continue its operation, is beside the point. TIAA has no primary responsibility for the operation of the convention center. The present discussion has for its purpose a depiction of the difference in the interests between TIAA and the City. They are significant.

For a case sustaining separate classifications of unsecured creditors where those being separated were a municipality and other creditors, see *Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993).

We hold, therefore, that the objection of TIAA on grounds of improper separate classification of TIAA and the City must be overruled, and we hold that such separate classification is justified.

■ 9. Section 1129(a)(11). The Bankruptcy Code here requires that:

(a) The court shall confirm a plan only if all of the following requirements are met:

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

This is what is familiarly known as the requirement of feasibility. The parties have litigated in this court with respect to whether TIAA has a lien on funds received by debtor from Hyatt pursuant to the Management Agreement. We held in debtor's favor on this issue. TIAA has taken an appeal from our decision. TIAA says that the success of the plan depends upon the availability to debtor of these funds, which will not be available to it should the court ultimately conclude that TIAA has a security interest in them. The whole of TIAA's argument in this respect is that this court cannot conclude that the plan is feasible until this question is finally settled. TIAA goes on to argue anticipatorally, that confirmation will not moot its appeal.

Debtor counters TIAA's argument by saying that, so far as this court is concerned, it must "make a determination regarding feasibility of the Plan in light of its ruling that the post-petition revenues are property of HRC's bankruptcy estate." We agree with debtor that we act on confirmation on the present state of the record. It is not for this court to anticipate the outcome of the appeal. That will be dealt with at the proper time.

In view of all of the foregoing, we will by separate order overrule all of the objections of TIAA, and confirm debtor's amended plan as modified.

## ORDER CONFIRMING AMENDED PLAN AS MODIFIED AND OVERRULING OBJECTIONS TO CONFIRMATION

Debtor has, pursuant to Chapter 11 of the Bankruptcy Code, filed an Amended Plan as modified which came before the court for confirmation. Teachers' Insurance and Annuity Association of America filed objections thereto. Hearing thereon was held at the hearing on confirmation. Adequate notice of the Amended Plan as modified was given to creditors and equity security holders. It having been determined after hearing on notice that the requirements for confirmation set forth in 11 U.S.C. § 1129(a) and (b) have

been satisfied, and that the objections are without merit,

IT IS ORDERED THAT:

1) The Amended Plan filed by the debtor on January 6, 1995, as modified by modifications filed on May 19, 1995 and June 9, 1995, respectively, is confirmed (copies attached); and

2) The objections to the Amended Plan as modified filed by Teachers' Insurance and Annuity Association of America are overruled.